[No. 36751-3-II.   Division Two.   August 25, 2009.]

ZDI GAMING, INC., *Respondent*, v. THE WASHINGTON STATE GAMBLING COMMISSION, *Appellant*.

---

[35] Clerk's Papers at 378.

790

*Robert M. McKenna, Attorney General,* and *H. Bruce Marvin, Assistant,* for appellant.

*Joan K. Mell* (of *III Branches Law, PLLC*), for respondent.

¶1 QUINN-BRINTNALL, J. — The Washington State Gambling Commission (Commission) denied ZDI Gaming, Inc., permission to distribute its VIP electronic pull tab machine. In this case, we address the following issues. First, we must decide whether ZDI timely perfected its appeal to the Thurston County Superior Court. If it did not, the Commission's decision stands. Second, if ZDI timely appealed the Commission's decision, we must apply the law applicable to administrative appeals, ch. 34.05 RCW, and address (1) whether the Commission properly determined that the "cash card" technology used in the VIP machine did not meet the regulatory definition of "cash," (2) whether the "cash card" meets the regulatory definition of "merchandise," and (3) whether the Commission properly denied ZDI permission to distribute the VIP machines. In addition, if ZDI timely perfected its appeal, we must address whether the superior

court erred when it awarded ZDI less than the $25,000 statutory maximum for attorney fees and costs.

¶2 We hold that, because this is an appeal under the Administrative Procedure Act (APA), ch. 34.05 RCW, Pierce County had subject matter jurisdiction over ZDI's appeal and, therefore, the appeal was timely, and we hold that the transfer of venue to Thurston County did not deprive that court of jurisdiction. We also hold that, applying the APA standards of review to the record of the Commission's decision denying ZDI's request to distribute its VIP machines, substantial evidence does not support the Commission's determination that ZDI's "cash cards" were not cash equivalents satisfying the regulatory definition of "cash." As to ZDI's cross appeal from the superior court's attorney fees award, we hold that the trial court should reconsider its decision to reduce ZDI's attorney fees based on its response to the Commission's motion to dismiss for lack of jurisdiction, and we remand to the Thurston County Superior Court to reconsider the award of attorney fees and costs.

## FACTS

FACTUAL BACKGROUND AND REGULATORY FRAMEWORK

### A.  PULL TABS

¶3 ZDI is a gaming supply distributorship licensed by the Commission. ZDI supplies pull tabs, bingo supplies, casino supplies, and other items related to the gambling industry in the state of Washington. ZDI has been involved with pull tabs and their associated equipment since approximately 1989.

¶4 Pull tabs predate the 1973 legalization of gambling in the state of Washington. Although there are several variations, a standard pull tab is a paper ticket that contains a series of windows that in turn conceal a series of numbers or symbols. *See* former WAC 230-02-260 (1973). Certain combinations of these numbers or symbols entitle the player to collect a prize. Former WAC 230-02-260. Each pull

tab series has a predetermined number of winning tickets. Former WAC 230-02-260. A sheet of paper posted next to the pull tab game, called a "flare," designates all prizes in excess of $20 in value; when a player wins a prize with a value over $20, the game operator must cross the prize off the flare, thereby informing players what prizes they can still win in any particular pull tab series. Former WAC 230-30-070(6) (2001); former WAC 230-30-106(4) (1997). Facilities such as bowling alleys, bars, and charities use pull tabs as an economic stimulant to increase the sale of food, drink, or other services.

¶5 In addition to purchasing pull tabs directly from an employee of an establishment, the Commission has authorized pull tab dispensing equipment. In an effort to attract more pull tab players and increase gambling revenues, gambling equipment manufacturers have developed pull tab dispensing machines with entertainment features. Not only do these machines dispense and read pull tabs, they also simulate the sounds and displays of electronic slot machines. Before a manufacturer can place a pull tab dispenser into play in the state of Washington, state law requires that the Commission review and approve the machine to ensure that it complies with all applicable gambling laws and regulations. Former WAC 230-12-316 (2003); former WAC 230-30-090 (1974).

¶6 The Commission's regulations strictly limit the types of prizes that a player can win in a pull tab game and narrowly circumscribe the consideration that a player can use to purchase pull tabs. Specifically, a player must purchase pull tabs with "cash, check, or electronic point-of-sale bank transfer." Former WAC 230-12-050(2) (2004). The operator must pay players pull tab prizes "in cash or in merchandise." Former WAC 230-30-070(1) (2001).

B.   THE VIP MACHINE

¶7 The first version of ZDI's electronic pull tab dispensing machine incorporated a pull tab dispenser and a pull tab reader. This version is an electronically powered, stand-

alone device that also features a video monitor display screen and a currency/bill acceptor. All of these features are housed in a decorative cabinet. ZDI intentionally designed the video monitor display to emulate a video slot machine; although the machine does not contain drums or spinning reels, the video display contains rows of "spinning" pictures and simulates the play of a slot machine that a player would typically encounter in a casino. The "reels" contain pictures and various characters that align in winning or losing combinations determined by the bar code on the inside of the paper pull tab that the player inserted into the machine. In addition to mimicking a slot machine, these machines emit "attractor" sounds, also commonly associated with casinos.

¶8 ZDI's updated version, the VIP machine, is a pull tab dispenser and reader with integrated "cash card" technology; with the exception of the integrated "cash card" technology, the VIP machine is largely identical to the earlier ZDI pull tab dispensing and reading machine already authorized for use by the Commission. The "cash card" technology is the critical difference between the two machines.

¶9 The earlier versions of the machine required a player to purchase the pull tab with currency and required that players redeem all winning pull tabs with a cashier. The VIP machine disposes of these steps by allowing a player to purchase pull tabs with a prepaid "cash card" and automatically crediting pull tab winnings of $20 or less back onto the "cash card." For winning pull tabs in excess of $20, the VIP machine directs the player to seek payment from an employee. If a player stops playing the game before depleting the "cash card," the player can use the remaining credit to purchase food, drink, or merchandise, or the player can simply turn the credit back into cash. The "cash card" operates as a means by which a player can purchase pull tabs and receive winnings of less than $20; the odds of winning for any individual player do not change from use of the "cash card."

PROCEDURAL HISTORY

A. THE APPLICATION AND ADMINISTRATIVE HEARING

¶10 On March 29, 2005, ZDI submitted an application to the commission staff seeking permission to distribute the VIP machine within the state of Washington. On August 15, 2005, the Commission staff issued a letter denying ZDI's application based on, in part, its determination that the VIP machine's "cash card" technology did not comply with the term "cash" as required to purchase pull tabs or with the terms "cash" or "merchandise" as required to redeem winning tickets. The commission staff also determined that the VIP machine was an illegal "gambling device." On September 21, 2005, ZDI filed a petition for declaratory relief with the Commission.

¶11 In its petition for declaratory relief, ZDI challenged the commission staff's interpretation of the Commission's regulatory language, arguing that the VIP machine's "cash card" technology was a "cash equivalent" that satisfied the regulatory definition of "cash." ZDI did not raise any other issues in the petition, nor did it raise additional issues during the administrative hearing proceedings.

¶12 To support its argument that the "cash cards" qualified as "cash equivalents," ZDI presented evidence about the ease and functionality of the cards and how functionally similar the "cash cards" were to cash. In addition, ZDI pointed to evidence that the Commission permitted Indian tribes to use similar technology at electronic scratch ticket terminals at tribal venues.

¶13 On May 1, 2006, the administrative law judge (ALJ) issued an initial declaratory order in which he held that the term "cash," as used in the Commission's regulations, meant currency or a universally accepted currency substitute. Because the VIP machine's "cash card" technology was not universally accepted, as its use was limited to a single establishment, the ALJ determined that it did not meet the

regulatory definition of "cash" or a "cash equivalent." As a result, the ALJ upheld the commission staff's decision.

¶14 Both parties filed petitions for review with the full Commission. ZDI challenged the ALJ's ruling, arguing that its "cash cards" qualified as "a cash equivalent."[1] On August 10, 2006, the full Commission issued a final declaratory order in which it upheld the ALJ's conclusions as to the definition of "cash," as well as the ALJ's determination that ZDI's "cash cards" did not meet the requirements of this definition.

### B. Petition for Judicial Review

¶15 On August 31, 2006, the Commission served ZDI with its final order. On September 11, 2006, ZDI filed a petition for judicial review with the Pierce County Superior Court. On September 21, 2006, the Commission notified ZDI that RCW 9.46.095 granted Thurston County Superior Court exclusive jurisdiction over the matter and suggested that ZDI dismiss its Pierce County action and refile in Thurston County. ZDI declined to do so.

¶16 On October 19, 2006, the Commission filed a motion to dismiss ZDI's petition for lack of subject matter jurisdiction. On December 1, 2006, the Pierce County Superior Court denied the Commission's motion, reasoning that, despite RCW 9.46.095's use of the word "jurisdiction," it actually controlled venue. As a result, the Pierce County Superior Court issued an order changing venue to Thurston County Superior Court.

¶17 On May 1, 2007, the Thurston County Superior Court heard argument on the petition for judicial review. On June 27, 2007, the superior court issued a letter opinion overruling the Commission's final order, reasoning that the

---

[1] The Commission sought review of the ALJ's determination that the VIP machine was not an illegal "gambling device" as defined by RCW 9.46.0241. And the Commission's final order "VACATED and *specifically disavowed*" the ALJ's ruling on this issue. Administrative Record (AR) at 962. Neither party appealed this issue to the superior court and, although both devote portions of their briefs on appeal to this issue, it is not properly before us to review.

VIP machine's "cash card" technology qualified as "cash" or a "cash equivalent." On August 17, 2007, the superior court denied the Commission's motion for reconsideration and remanded the case to the Commission for actions conforming with its ruling. The superior court also awarded ZDI $18,185 in attorney fees and costs under RCW 4.84.350.

¶18 On September 14, 2007, the Commission timely appealed to this court. On September 17, 2007, ZDI timely filed a notice of cross appeal on the attorney fee award.

ANALYSIS

THE COMMISSION'S DIRECT APPEAL

A. SUBJECT MATTER JURISDICTION

¶19 The Commission asks us to affirm the Commission's final order, arguing that neither the Pierce County Superior Court nor the Thurston County Superior Court had subject matter jurisdiction over ZDI's petition for judicial review. Specifically, the Commission contends that RCW 9.46.095 grants Thurston County Superior Court exclusive jurisdiction over all nonlicensing actions filed against the Commission. The Commission asserts that the statute's plain language demonstrates that the legislature intended "jurisdiction" to mean "subject matter jurisdiction," and to limit subject matter jurisdiction over appeals of its agency decisions to Thurston County Superior Court. It argues that because ZDI improperly filed its appeal with the Pierce County Superior Court, Pierce County lacked jurisdiction and that its order changing venue to Thurston County was invalid. As a result, the Commission contends that ZDI failed to timely perfect its appeal in Thurston County within 30 days of the Commission's final order as required by RCW 34.05.542(2),[2] and any attempt to do so would have been time barred.

---

[2] RCW 34.05.542(2) states, "A petition for judicial review of an order shall be filed with the court and served on the agency, the office of the attorney general, and all parties of record within thirty days after service of the final order."

¶20 ZDI responds that, despite the legislature's use of the word "jurisdiction" in RCW 9.46.095, it intended to refer to "venue." We agree with ZDI.

■■ ¶21 Venue and jurisdiction are distinct concepts. "Subject matter jurisdiction" typically refers to the authority of a court to act and does not depend on procedural rules. *Dougherty v. Dep't of Labor & Indus.*, 150 Wn.2d 310, 315, 76 P.3d 1183 (2003). A party may challenge subject matter jurisdiction at any time and a judgment entered by a court lacking jurisdiction is void. *Inland Foundry Co. v. Spokane County Air Pollution Control Auth.*, 98 Wn. App. 121, 123-24, 989 P.2d 102 (1999), *review denied*, 141 Wn.2d 1007 (2000); *see also In re Marriage of Ortiz*, 108 Wn.2d 643, 649-50, 740 P.2d 843 (1987).[3] When a court lacks subject matter jurisdiction, the only permissible action it may take is to dismiss the action. *Inland Foundry Co.*, 98 Wn. App. at 123-24.

¶22 A court may have subject matter jurisdiction even though it is not the court of proper venue. *See Dougherty*, 150 Wn.2d at 315 (where jurisdiction exists, but the venue is incorrect, the case need not be dismissed; instead, it can be transferred to a court with proper venue (citing *Indus. Addition Ass'n v. Comm'r*, 323 U.S. 310, 315, 65 S. Ct. 289, 89 L. Ed. 260 (1945))). But a court is not bound to exercise its jurisdiction where proper venue is in another court. *Dougherty*, 150 Wn.2d at 315 (citing *Indus. Addition Ass'n*, 323 U.S. at 315).

¶23 Both parties rely on *Dougherty* to support their contrary interpretations of RCW 9.46.095.[4]

---

[3] ZDI mistakenly asserts that the Commission waived this issue by failing to raise it before the Thurston County Superior Court.

[4] The Commission also urges this court to take 1999 Attorney General Opinion No. 7 into consideration. According to the Commission, this opinion "recogniz[es] that the Gambling Commission 'could use its regulatory discretion in deciding whether to authorize [electronic pull tab dispenser] and with what limitations.' " Commission's Statement of Additional Authorities at 1. But "Attorney General Opinions are not binding on the court and we may disregard them." *City of Pasco v. Dep't of Ret. Sys.*, 110 Wn. App. 582, 592 n.11, 42 P.3d 992, *review denied*, 147 Wn.2d 1017 (2002).

¶24 In *Dougherty*, our Supreme Court addressed whether a statute that designated where workers could file industrial insurance claims controlled venue or subject matter jurisdiction. 150 Wn.2d at 315. The statute, without using the terms "venue" or "jurisdiction," provided that a worker could file an appeal from a ruling by the Board of Industrial Insurance Appeals in the county in which the worker resides, the county where the injury occurred, or, if neither are within the state, then in Thurston County. *Dougherty*, 150 Wn.2d at 313. Our Supreme Court reasoned that the key distinction between jurisdiction and venue is that the critical issue regarding subject matter jurisdiction is "type of controversy," while the critical issue in venue is "location." *Dougherty*, 150 Wn.2d at 316.

¶25 The *Dougherty* court went on to state that statutes requiring actions to be brought in particular counties are generally regarded as specifying the proper *venue* and " 'are ordinarily construed not to limit jurisdiction of the state courts to the courts of the counties thus designated.' " 150 Wn.2d at 316 (quoting 77 AM. JUR. 2D *Venue* § 44, at 651 (1997)). Because the statute in *Dougherty* allowed the worker to file in virtually any superior court in Washington, depending on the circumstances of the injury, the *Dougherty* court held that it conferred subject matter jurisdiction over industrial insurance appeals on all superior courts and the procedural specifications regarding where the worker had to file his claim controlled only venue. 150 Wn.2d at 316-17.

¶26 In *Shoop v. Kittitas County*, 149 Wn.2d 29, 65 P.3d 1194 (2003), our Supreme Court analyzed whether a statute stating " '[a]ll actions against any county may be commenced in the superior court of such county, or of the adjoining county' " addressed jurisdiction or venue. 149 Wn.2d at 33 (quoting former RCW 36.01.050 (1963)). The *Shoop* court reasoned that, wherever possible, the meaning of a statute should be derived from the plain language of that statute and that "commence" means " '[t]o initiate by performing the first act . . . [t]o institute or start.' " 149

Wn.2d at 34 (alterations in original) (internal quotation marks omitted) (quoting *Cossel v. Skagit County*, 119 Wn.2d 434, 436, 834 P.2d 609 (1992), *overruled by Shoop*, 149 Wn.2d 29). The *Shoop* court reasoned that this language was jurisdictional because the legislature would not have given the plaintiffs the right to "commence" a lawsuit in a particular county without also giving that county's superior court subject matter jurisdiction. 149 Wn.2d at 34. Moreover, article IV, section 6 of the Washington State Constitution states, " '[T]he superior court shall also have original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court.' " *Shoop*, 149 Wn.2d at 37 (quoting WASH. CONST. art. IV, § 6). More important, the *Shoop* court went on to clearly state that article IV, section 6 "precludes any subject matter [jurisdiction] restrictions as among superior courts." 149 Wn.2d at 37. Thus, our Supreme Court held that the filing requirements related to venue only. *Shoop*, 149 Wn.2d at 37.

B.   APPLICABLE RESTRICTIONS IN RCW 9.46.095

¶27  We now turn to the meaning of "jurisdiction" in RCW 9.46.095. We review issues of statutory construction de novo. *Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 612, 90 P.3d 659 (2004) (citing *Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology*, 146 Wn.2d 778, 790, 51 P.3d 744 (2002)). When faced with an unambiguous statute, we derive the legislature's intent from the plain language alone. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994).

¶28  When a statute is ambiguous, we apply principles of statutory construction, legislative history, and relevant case law to assist our interpretation. *Yousoufian v. Office of King County Executive*, 152 Wn.2d 421, 434, 98 P.3d 463 (2004) (citing *State v. Watson*, 146 Wn.2d 947, 955, 51 P.3d 66 (2002)). A statute is ambiguous if it can reasonably be interpreted in more than one way. *Yousoufian*, 152

Wn.2d at 433-34 (quoting *Vashon Island Comm. for Self-Gov't v. Wash. State Boundary Review Bd.*, 127 Wn.2d 759, 771, 903 P.2d 953 (1995)). Moreover, "[w]hen construing a statute, the court must ascertain and give effect to the Legislature's intent." *Shoreline Cmty. Coll. Dist. No. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 405, 842 P.2d 938 (1992).

¶29 The gambling act provides that "[e]xcept as otherwise provided in this chapter, all proceedings under this chapter shall be in accordance with the [APA]." RCW 9.46.140(5). It further provides that

> [n]o court of the state of Washington other than the superior court of Thurston county shall have *jurisdiction* over *any action or proceeding against the commission or any member thereof* for anything done or omitted to be done in or arising out of the performance of his or her duties under this title: PROVIDED, That an appeal from an adjudicative proceeding involving a final decision of the commission to deny, suspend, or revoke a license shall be governed by chapter 34.05 RCW, the [APA].

RCW 9.46.095 (emphasis added).

¶30 As demonstrated above, "jurisdiction" may refer to subject matter jurisdiction or, in some circumstances, venue. *See, e.g.*, *Myuskovich v. State*, 59 Wyo. 406, 141 P.2d 540 (1943) (a bastardy statute that conferred "jurisdiction" on the district court in which the parent or child resides actually controls venue); *Bailiff v. Storm Drilling Co.*, 356 F. Supp. 309, 311 (E.D. Tex. 1972) (the venue provision of the Jones Act, which provides that " '[j]urisdiction . . . shall be under the court of the district in which the defendant employer resides or in which his principal office is located,' " addressed venue (quoting 46 U.S.C.A. § 688)).

¶31 We construe statutes as constitutional whenever possible. *Philippides v. Bernard*, 151 Wn.2d 376, 391, 88 P.3d 939 (2004) (citing *State ex rel. Faulk v. CSG Job Ctr.*, 117 Wn.2d 493, 816 P.2d 725 (1991)). A constitutional reading of RCW 9.46.095 suggests that the statute was intended to govern venue and that the APA, ch. 34.05 RCW,

governs appeals of agency decisions. ZDI's action in Pierce County Superior Court was an appeal of the Commission's decision and is governed by the APA. Because the APA governs this appeal, Pierce County Superior Court had subject matter jurisdiction over ZDI's appeal and its order changing venue to Thurston County was valid.[5]

¶32 We now turn to a review of the merits of the controversy. As an appeal from the Commission's denial of ZDI's request to distribute its VIP machine in Washington State, chapter 34.05 RCW, the APA, governs RCW 9.46.095.

C.  STANDARD OF REVIEW

¶33 When reviewing an agency's decision, we sit in the same position as the trial court and apply the appropriate standard of review directly to the agency record. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). The burden of demonstrating the invalidity of agency action is on the party asserting invalidity, here ZDI. RCW 34.05.570(1)(a). Under RCW 34.05.570, a party may challenge an agency's actions on nine bases. *Quadrant Corp. v. Central Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 233, 110 P.3d 1132 (2005). Relevant here are

(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

. . . .

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

---

[5] ZDI also argues that (1) RCW 9.46.095 conflicts with the APA's jurisdictional provision in RCW 34.05.510 and, because the APA is the more specific statute, it applies and (2) the state claims statute, RCW 4.92.010, applies to this case because it is a suit against the State of Washington. Our resolution of this issue makes it unnecessary for us to address these arguments.

. . . .

(i) The order is arbitrary or capricious.

RCW 34.05.570(3).

¶34 The error of law standard applies to issues relating to whether an agency erroneously interpreted or applied the law. RCW 34.05.570. We review those issues de novo but grant substantial weight and deference to an agency's interpretation of its own regulations. *Tapper*, 122 Wn.2d at 403. When faced with an unambiguous regulation, we do not speculate as to the intent of the regulation or add words to it, although we discern intent from the underlying statutory authority. *Mader v. Health Care Auth.*, 149 Wn.2d 458, 473, 70 P.3d 931 (2003). We uphold an agency's interpretation of ambiguous regulatory language as long as the agency's interpretation is plausible and consistent with the legislative intent. *Alpine Lakes Prot. Soc'y v. Dep't of Natural Res.*, 102 Wn. App. 1, 14, 979 P.2d 929 (1999).

¶35 An agency's decision is arbitrary and capricious only if it " 'is willful and unreasoning and taken without regard to the attending facts or circumstances.' " *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 149 Wn.2d 17, 26, 65 P.3d 319 (2003) (internal quotation marks omitted) (quoting *Rios v. Dep't of Labor & Indus.*, 145 Wn.2d 483, 501, 39 P.3d 961 (2002)). The arbitrary and capricious standard is very narrow and, as with other challenges to agency action, the party asserting it bears a heavy burden. *Greenen v. Bd. of Accountancy*, 126 Wn. App. 824, 830, 110 P.3d 224 (2005), *review denied*, 156 Wn.2d 1030 (2006). We do not substitute our judgment for that of the agency and "will upset [an agency's] determination only if the evidence establishes it was arrived at by unlawful, arbitrary or capricious action." *State ex rel. Rosenberg v. Grand Coulee Dam Sch. Dist. No. 301 J*, 85 Wn.2d 556, 563, 536 P.2d 614 (1975).

¶36 In any event, we review agency findings for substantial evidence in light of the whole record. RCW

34.05.570(3)(e). "Substantial evidence" is evidence that is sufficient to persuade a fair-minded person of the truth or correctness of the matter. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000).

### 1. DEFINITION OF "CASH"

¶37 Like the ALJ, the Commission determined that the ZDI "cash card" does not meet the regulatory definition of "cash." The Commission's determination that "cash" means currency or a universally accepted currency equivalent is entitled to substantial deference because it falls within the Commission's area of expertise, is consistent with the plain meaning of the term "cash," and advances the purposes of the gambling act. The Commission contends that because ZDI's "cash cards" used in the VIP machine were valid at only one location, they were not universally accepted and, therefore, did not meet the definition of a "universally accepted currency equivalent." ZDI responds that, as routinely applied by the Commission, the definition of "cash equivalents" does not include universal acceptance. ZDI points to other cash equivalents accepted by the Commission, such as vouchers and chips, which are not universally accepted.[6] We agree with ZDI. The record

---

[6] ZDI also points to similar technology being used at tribal casinos as further evidence that the Commission should permit its "cash card" technology. Although the Indian Gaming Regulatory Act requires that any type of gambling allowed by the state is subject to compact negotiations between the state and a qualified tribe, it does not require that the Commission make technology used in tribal casinos available to nontribal entities, despite ZDI's assertion to the contrary. 25 U.S.C. § 2710(d)(1)(B). In Washington, the tribes and the State negotiated compact provisions that allow tribes to offer a lottery system that couples an electronic facsimile of a "scratch ticket" with the electronic delivery system used in "Lotto." *See Rumsey Indian Rancheria of Wintun Indians v. Wilson*, 41 F.3d 421, 64 F.3d 1250 (9th Cir. 1994); *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024 (2d Cir. 1990), *cert. denied*, 499 U.S. 975 (1991). But this is a unique system that is not available for use by nontribal licensees because the gambling act and its related regulations control their gambling activities. Despite the similarity of this cashless system, the ALJ rejected this evidence because "regulatory controls for [tribal] systems are governed by compacts, not administrative code provisions," making these systems entirely independent from the nontribal pull tabs at issue here. AR at 421. Because a separate and distinct regulatory system controls the tribal systems, it is not analogous to the case at hand.

shows that to obtain a "cash card," the player must tender United States currency or a universally accepted currency equivalent; substantial evidence does not support the Commission's finding that ZDI's "cash card" does not meet the regulatory definition of "cash."

¶38 Here, the Commission's conclusion that "cash" means legal currency or a universally accepted currency equivalent is reasonable and consistent with the common usage of the term "cash" and the policies and intent underlying the gambling act, ch. 9.46 RCW, as well as dictionary definitions of the word "cash." *See* BLACK'S LAW DICTIONARY 229 (8th ed. 2004) ("**cash,** *n.* **1.** Money or its equivalent. **2.** Currency or coins, negotiable checks, and balances in bank accounts"); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 346 (1976) (defines "cash" as "ready money," "money or its equivalent paid immediately or promptly after purchasing").

¶39 In addition, the Commission's narrow definition of "cash" is consistent with its powers and duties, as well as the underlying intent of the gambling act. The public policy of the State of Washington on gambling is to "limit[ ] the nature and scope of gambling activities . . . by strict regulation and control." RCW 9.46.010. Moreover, the gambling act directs that "[a]ll factors incident to the activities authorized in this chapter shall be closely controlled, and the provisions of this chapter shall be liberally construed to achieve such end." RCW 9.46.010. And the Commission is specifically authorized to "regulate and establish the type

---

ZDI also contends that, if the Commission allows tribal entities to use cashless technology but does not permit ZDI to use its "cash cards," the Commission's "arbitrary" distinction violates ZDI's right to substantive due process. Specifically, ZDI argues that such a discrepancy is "fundamentally unfair." But ZDI's argument that such a distinction is "unfair" is insufficient to merit our consideration; ZDI failed to articulate a fundamental right that a state law has infringed upon. *See Mudarri v. State*, 147 Wn. App. 590, 196 P.3d 153 (2008), *review denied*, 208 P.3d 1123 (2009). In *Mudarri*, a private casino owner argued that the Commission's refusal to allow him to operate electronic scratch ticket games, while allowing tribal casinos to do so, violated his right to substantive due process because it was " 'fundamentally unfair.' " 147 Wn. App. at 616. We refused to consider the issue because the private casino owner, like ZDI here, failed to explain how he was deprived of " 'life, liberty, or property, without due process of law.' " *Mudarri*, 147 Wn. App. at 616 (quoting U.S. CONST. amend. XIV, § 1).

and scope of and manner of conducting the gambling activities authorized by this chapter, including but not limited to, the extent of wager, money, or other thing of value which may be wagered or contributed or won by a player in any such activities." RCW 9.46.070(11). The gambling act also authorizes the Commission "[t]o perform all other matters and things necessary to carry out the purposes and provisions of this chapter." Former RCW 9.46.070(20) (2002). Thus, to enable the Commission to accomplish its purpose, the gambling act grants it broad statutory authority to regulate and control all state-sanctioned gambling activity, including the game of pull tabs, pull tab dispensing equipment, and any form of payment system incorporated therein, such as the "cash card" technology incorporated into the VIP machine.

¶40 Here, the Commission's interpretation of "cash" is consistent with the legislature's policy favoring close control of gambling and it is reasonable and consistent with the underlying intent of the gambling act. Despite the reasonableness of the Commission's definition of "cash," however, substantial evidence does not support its determination that ZDI's "cash card" does not satisfy this otherwise defensible regulatory definition. Although the ZDI "cash card" is not, in and of itself, cash or a universally accepted equivalent, a player must tender either cash or a universally accepted equivalent to obtain the card. The cards may not be purchased on credit. In addition, because this conversion takes place on the business' premises and the player must use cash or a cash equivalent to obtain the card, the card functions as a cash equivalent in that establishment. That it cannot be used as cash at another establishment is a distinction without a difference: the player tendered cash or a cash equivalent in exchange for a "cash card" and can either spend the entire card in the VIP game or receive cash back at the end of his or her play for any unused portion.[7] The

---

[7] In addition to authorizing the Commission to define the game of pull tabs, the legislature has specified that pull tabs must function as a "commercial stimulant" and a "social pastime[]." RCW 9.46.010, .0217, .0325. As a "commercial stimu-

record does not support the Commission's determination that ZDI "cash cards" are not cash equivalents satisfying its regulatory definition.

### 2. DEFINITION OF "MERCHANDISE"

¶41 The Commission contends that ZDI's alternative argument that its "cash card" technology satisfies the term "merchandise" as the term is used in former WAC 230-30-070(1) is both procedurally and substantively flawed.[8] Specifically, the Commission argues that ZDI never sought declaratory relief from the ALJ on this issue and, thus, it is not properly before our court. Our review of the record reveals that ZDI did not seek declaratory relief from the Commission regarding whether its "cash card" technology qualified as "merchandise." Because ZDI failed to exhaust its administrative remedies, we do not consider this issue.

¶42 Throughout the administrative proceeding before the ALJ, ZDI claimed it was entitled to relief because its "cash card" was a "currency equivalent." ZDI did not contend that the card constituted "merchandise" in its petition for declaratory relief or during the administrative proceedings; instead, ZDI's sole basis for relief in its peti-

---

lant," pull tabs can only be sold in conjunction with food and drink "with the purpose of increasing the volume of food and/or drink sales for 'on-premises' consumption." RCW 9.46.0325; former WAC 230-02-350 (1995). As a "social pastime[ ]," patrons must play pull tabs "more for amusement rather than for profit." RCW 9.46.010; former WAC 230-02-455 (1996). The Commission argues that by using the "cash card" technology, the VIP machine will impact the way customers play the game of pull tabs by (1) speeding up the rate of play and (2) removing the element of human interaction from the game. Although the gambling act does not specifically prohibit either potential change in the game, the Commission argues that they conflict with the gambling act's policies requiring that pull tabs merely be in conjunction with other activities, such as eating, drinking, and being social. By allowing the game to be sped up and then to allow players to avoid any interruption in play, the Commission argues that ZDI's "cash card" technology takes away from these general policies. But the Commission did not rule on the effect of these policy implications and, thus, the Commission's claimed reliance on these alleged effects after ZDI filed its legal action is arbitrary and capricious. Moreover, because a player must tender currency or a universally accepted currency equivalent in exchange for the "cash card," these policies are not implicated.

[8] Specifically, the Commission argues that the superior court's conclusion is inconsistent with the broader regulatory scheme, which contemplates that "merchandise" be a type of good that can be displayed, photographed, and handled.

tion for declaratory relief centered on the definition of "cash." Specifically, in its petition for declaratory relief, ZDI argued that (1) its "cash cards" were a "cash equivalent," (2) the administrative code did not prohibit the use of "cash cards," (3) the actual controversy at issue addressed the meaning of the term "cash," and (4) a favorable determination in this matter would not adversely affect the general public because the public understands that "cash cards" are a cash equivalent.

¶43 ZDI argues that whether the "cash cards" qualified as "merchandise" was an issue before the ALJ, the Commission, and the superior court. But the record belies this contention. Although there were brief references to "merchandise" before the ALJ regarding gift certificates and the distinction between gift certificates and "cash cards" as they apply to "merchandise," ZDI never affirmatively argued before the ALJ that "cash cards" qualified as "merchandise." Moreover, following these references, ZDI did not amend its pleadings to include any argument about the definition of "merchandise," nor did it request a ruling on this issue. The first time ZDI affirmatively argued that a "cash card" was "merchandise" was in its petition for review of the ALJ's order to the full Commission and then in its trial brief before the superior court.

¶44 Because ZDI did not seek declaratory relief from the Commission regarding whether its "cash card" technology qualified as "merchandise," neither the ALJ nor the Commission considered this issue when making their respective decisions and both orders are silent on this issue. Moreover, ZDI cannot raise this issue for the first time on judicial review. RCW 34.05.554; *King County v. Boundary Review Bd.*, 122 Wn.2d 648, 670, 860 P.2d 1024 (1993) (issues not raised at the agency level may not normally be raised for the first time on judicial review); *see Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 866, 947 P.2d 1208 (1997) (a party may file a petition for judicial review only after they have exhausted all administrative remedies available within the agency whose actions are

being challenged (citing RCW 34.05.534)). We decline to address whether ZDI's cash card qualified as "merchandise" under former WAC 230-30-070(1).

ATTORNEY FEES

¶45 In its cross appeal, ZDI argues that the superior court erred when it awarded ZDI $18,185 in attorney fees instead of the statutory maximum of $25,000.[9] Specifically, ZDI argues that "[t]he cost and fee award of less than $25,000.00 contravenes the public policy objectives of the Equal Access to Justice Act [(EAJA)]," RCW 4.84.350, Br. of Resp't at 48, because the superior court should have calculated fees at counsel's rate of $250 per hour rather than the suggested statutory rate of $150. Moreover, ZDI argues that the superior court erred when it subtracted time spent on the Commission's motion to dismiss before the Pierce County Superior Court and ZDI's motion to supplement the record.[10] We hold that the statutory rate was sufficient and, although the superior court appropriately refused to award ZDI attorney fees for motions that did not have merit, it should reexamine its decision to exclude fees based on the Commission's motion to dismiss for lack of subject matter jurisdiction.

¶46 Under the EAJA, a party that prevails in a judicial review of an agency action is entitled to attorney fees and

---

[9] In its argument heading regarding attorney fees, ZDI suggests that the equal access to justice act's $25,000 cap on attorney fees is unconstitutional. But ZDI does not offer any argument or citation to legal authority supporting this position and, as a result, we do not consider this issue. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."), *review denied*, 136 Wn.2d 1015 (1998).

[10] ZDI assigned error to the superior court's denial of its motion to supplement the record. But ZDI's only argument on this issue appears as part of ZDI's attorney fee argument: "ZDI objects to [the superior court's refusal to supplement the record] because the complete record further supports ZDI's position [and] ZDI had the right to make the request pursuant to the terms of the APA. RCW 34.05.566(7)." Br. of Resp't at 50. RCW 34.05.566(7) provides, "The court may require or permit subsequent corrections or additions to the record." ZDI's argument and citation to legal authority is not sufficient to support ZDI's assignment of error and, as a result, we do not consider this issue. *Holland*, 90 Wn. App. at 538.

other expenses unless "the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). To be entitled to an award of attorney fees under the EAJA, a qualified party is deemed to have prevailed if that party obtained relief on a significant issue. RCW 4.84.350(1). The amount the trial court can award a qualified party is limited to $25,000. RCW 4.84.350(2). The trial court may, at its discretion, award less than $25,000 to the extent that a qualified party engaged in conduct that unduly or unreasonably protracted the final resolution of the matter. RCW 4.84.350(2). We review a fee awarded under the EAJA for abuse of discretion and will not disturb that award absent a clear showing of abuse of that discretion. *Alpine Lakes*, 102 Wn. App. at 19; *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 65, 738 P.2d 665 (1987).

### A. STATUTORY HOURLY RATE

¶47 ZDI contends that the superior court erred when it failed to calculate Joan Mell's fee at a rate of $250 rather than the suggested statutory rate of $150. Specifically, ZDI argues that "special factors" such as " 'the limited availability of qualified attorneys for the proceedings involved justifies a higher fee' " and the travel required for the various hearings in this case also justify a rate in excess of the statutory recommendation. Br. of Resp't at 49 (quoting RCW 4.84.340(3)). We disagree.

¶48 RCW 4.84.340(3) provides that "attorney[ ] fees shall not be awarded in excess of one hundred fifty dollars per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." Federal courts, when determining whether "special factors" justify an upward departure from the statutorily set hourly rate, have found that expertise, where the case did not require any specialized knowledge, skill, or technical education, will not justify a higher rate. *In re Sealed Case 00-5116*, 349 U.S. App. D.C.

156, 254 F.3d 233 (2001); *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Labor*, 962 F. Supp. 191 (D.D.C. 1997), *aff'd*, 333 U.S. App. D.C. 7, 159 F.3d 597 (1998). Specialized expertise includes practice in a specialty area of the law, such as patent law, or knowledge of a foreign law or language. *Pierce v. Underwood*, 487 U.S. 552, 572, 108 S. Ct. 2541, 101 L. Ed. 2d 490 (1988).

¶49 Federal courts have found that specialized knowledge is insufficient where attorneys have acquired such knowledge through practicing in the field of administrative law. *Prowest Diversified, Inc. v. United States*, 40 Fed. Cl. 879 (1998). The statutory cap may be exceeded only in the " 'unusual situation' where the legal services rendered require specialized training and expertise unattainable by a competent attorney through a diligent study of the governing legal principles." *Chynoweth v. Sullivan*, 920 F.2d 648, 650 (10th Cir. 1990). "[M]erely because some scholarly effort and professional experience is required to attain proficiency in a particular practice area does not automatically require enhancement of the EAJA rate." *Chynoweth*, 920 F.2d at 650. And even if an area of law involves a complex statutory and regulatory framework, the field may not be beyond the grasp of a competent practicing attorney with access to a law library and the other accoutrements of modern legal practice. *Chynoweth*, 920 F.2d at 650. In order to qualify for an upward departure, an attorney's expertise must be truly exceptional and beyond the knowledge and ability of an otherwise capable litigator; if not, the exception would swallow the rule and every qualified attorney would be able to seek and obtain an upward modification of the statutory hourly fee rate. *Pierce*, 487 U.S. at 572.

¶50 Here, Mell represented ZDI throughout the administrative proceedings and the petition for judicial review before the superior court. In its motion for award of attorney fees and costs, ZDI urged the superior court to increase the hourly statutory fee from $150 to $250 because "[t]he limited availability of a qualified attorney for the proceed-

ing involved justifies the higher rate." Clerk's Papers at 766. In support of its motion, ZDI offered Paul Nordsletten's declaration. Nordsletten opined that he did not know of any attorneys who shared the same credentials as Mell who would have agreed to handle ZDI's case for $150 per hour and that the prevailing rates for this type of work frequently exceeded Mell's $250 rate. But these documents fail to establish that Mell possessed specialized expertise that was beyond the knowledge and ability of an otherwise capable litigator. Moreover, *Pierce* specifically rejected the argument that the limited availability of qualified attorneys for a particular proceeding was sufficient to qualify as a "special factor" under the federal statutes. 487 U.S. at 572. Because ZDI failed to establish that Mell had exceptional experience beyond the knowledge and ability of other capable litigators, it was not entitled to increase the suggested statutory rate.

B.   UNREASONABLE AND UNDUE DELAY OF FINAL RESOLUTION

¶51 ZDI next contends that the superior court erred when it excluded fees based on ZDI's (1) response to the Commission's motion to dismiss for lack of subject matter jurisdiction, (2) unsuccessful motion to supplement the record, and (3) unsuccessful opposition to the Commission's partial motion to dismiss. Although the trial court properly excluded fees associated with ZDI's unsuccessful motion to supplement the record and its unsuccessful opposition to the Commission's partial motion to dismiss, the trial court should not have excluded fees that ZDI incurred based on the Commission's motion to dismiss for lack of subject matter jurisdiction.

¶52 Here, the superior court improperly denied ZDI attorney fees based on fees incurred following the Commission's motion to dismiss for lack of subject matter jurisdiction because, as shown above, the Pierce County Superior Court had subject matter jurisdiction over this case. But the superior court properly excluded fees related to ZDI's unsuccessful attempt to supplement the record and its

unsuccessful opposition to the Commission's motion for partial dismissal. Both of these motions arose from ZDI's attempts to expand the scope of its petition for judicial review to include review of a later filed petition for rule change that ZDI filed with the Commission in the summer of 2006. The Commission opposed ZDI's motion to supplement and filed its partial motion for dismissal because ZDI had failed to exhaust its administrative remedies on this issue. Because both motions stemmed from attempts to have the superior court review a matter that was not ripe for review, ZDI unreasonably delayed the resolution of this case.

ZDI's Appendices and Citation to the Record

¶53 The Commission urges this court to disregard the three appendices attached to ZDI's respondent's brief/cross appeal because the documents are not part of the administrative or superior court records below. ZDI responds that, because these documents are public information, its inclusion of these documents is proper.[11] We agree with the Commission.

¶54 Appendix 1 is entitled "Tribal Lottery System player terminal inventory for the State of Washington Gambling Commission" and is dated July 13, 2005; ZDI did not offer this document as evidence during either the administrative or the superior court proceedings below. Br. of Resp't, App. 1. Appendix 2, "Rule Up For Discussion and Possible Filing," relates to a proposed rule change discussed at the Commission's March 14, 2008 meeting. Br. of Resp't, App. 2. And appendix 3 is a "Petition for Declaratory Order and OPMA Complaint," dated February 12, 2008, filed by ZDI and one of ZDI's owners against the State; the Commission; the Commission's director, an ex officio member of the Commission; and certain Commission members in their official and personal capacities. Br. of Resp't, App. 3. Appendix 2 and

---

[11] ZDI also improperly responds to the Commission's issues on appeal in its reply brief for its cross appeal; we disregard these arguments. *See* RAP 10.3.

appendix 3 both postdate the administrative and superior court records below.

¶55 Because these appendices are not part of the administrative record, we do not consider them. RAP 10.3(a)(8) ("[a]n appendix [to a brief] may not include materials not contained in the record on review without permission from [this court], except as provided in rule 10.4(c)"); *Den Beste v. Pollution Control Hearings Bd.*, 81 Wn. App. 330, 332-33, 914 P.2d 144 (1996) (subject to certain limited exceptions, facts relevant to review of an administrative proceeding are established at the administrative hearing). Moreover, these documents are not rules, statutes, or any other form of legal authority. RAP 10.4(c) (authorizing parties to append texts of statutes, rules, regulations, and other documents that are part of the record below to their briefs). As a result, ZDI should not have appended them to its brief without leave of this court,[12] which it did not seek. We disregard these appendices and ZDI's factual assertion supported by these documents.

¶56 In light of our decision that the Commission's challenge to the Pierce County Superior Court's subject matter jurisdiction fails, the superior court on remand should reconsider its decision to reduce ZDI's attorney fees incurred with respect to that motion. *Wiley v. Rehak*, 143 Wn.2d 339, 348, 20 P.3d 404 (2001) (a prevailing party may recover attorney fees authorized by statute, equitable principles, or agreement between the parties).

■ ¶57 ZDI did not request attorney fees on appeal in its opening brief for its cross appeal; instead, it limited its request to an award under the EAJA for fees and costs incurred at the superior court level. But for the first time in

---

[12] ZDI could have sought to supplement the record on appeal before us under RCW 34.05.562(1) of the APA, which permits us to receive new evidence if the evidence (1) relates to the validity of the agency action at the time it was taken and (2) is needed to decide disputed issues regarding (a) improper constitution of a decision-making body or grounds for disqualification of those taking agency action; (b) unlawful procedure or decision-making process; or (c) material facts in rule making, brief adjudications, or other proceedings not required to be determined by the agency record. But ZDI did not attempt to do so.

its reply brief, ZDI asks this court to award it an additional $25,000 in attorney fees and costs under the EAJA based on the expenses it has incurred responding to the Commission's appeal before this court. We do not consider arguments made for the first time in a reply brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

¶58 Accordingly, the Commission's appeal of the Thurston County Superior Court's decision is denied. ZDI's cross appeal from the superior court's attorney fee award is granted in part. We remand to the Thurston County Superior Court for reconsideration of attorney fees and costs and further proceedings consistent with this opinion and remand to the Commission for further action based on our decision that its denial of ZDI's request to distribute its VIP machine is not supported by substantial evidence.

VAN DEREN, C.J., and PENOYAR, J., concur.