IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BRUCE PLEASANT and KIMBERLY PLEASANT, a marital community, | ) ) ) | No. 69143-1-I |
| | ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | ORDER GRANTING MOTION TO PUBLISH |
| REGENCE BLUE SHIELD, | ) ) | |
| Respondent. | ) ) | |

Respondent Regence Blue Shield filed a motion to publish the opinion filed on March 31, 2014 in the above case and the appellants have filed an answer to the motion. A majority of the panel has determined that the motion should be granted;

Now, therefore, it is hereby

ORDERED that respondent's motion to publish the opinion is granted. It is further

ORDERED that the motion for sanctions set May 23, 2014 is stricken.

DATED this 16th day of May, 2014.

FOR THE COURT:

Judge



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BRUCE PLEASANT and KIMBERLY PLEASANT, a marital community, | ) ) ) | No. 69143-1-I |
| | ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| REGENCE BLUE SHIELD, | ) ) | |
| Respondent. | ) ) | FILED: March 31, 2014 |

SCHINDLER, J. — Bruce Pleasant sued Regence BlueShield alleging breach of contract, bad faith, and violation of the Consumer Protection Act, chapter 19.86 RCW, for denying coverage for nonrehabilitative services and medications he received during inpatient rehabilitation and for a mechanical embolectomy procedure. On cross motions for summary judgment, the court dismissed the lawsuit against Regence. We affirm.

FACTS

Bruce Pleasant had an individual health care plan with Regence BlueShield in 2010. The health care plan was approved by the Washington State Office of the Insurance Commissioner.[1]

On March 18, 2010, 50-year-old Pleasant suffered a stroke while undergoing knee surgery at Stevens Hospital. Pleasant was transported to Swedish Medical Center

---

[1] See RCW 48.44.020 and WAC 284-43-920.

and admitted to the intensive care unit (ICU). The doctors performed a number of medical procedures including a mechanical embolectomy.[2]

On March 22, Pleasant's relative, Bob Quigley, called Regence to ask about rehabilitation coverage. Regence informed Quigley that the health care plan had a "$4,000 per calendar year maximum" for inpatient rehabilitation. The transcript of the phone call between Quigley and Regence customer service representative Shannon Grim states, in pertinent part:

> BOB: He's going to need therapy, some sort of rehabilitation therapy. Is there a special coverage for that?
> SHANNON: There is, and I want to be able to explain it so it isn't confusing. It is considered a rehab benefit, which is occupational, rehab, speech, massage therapy, all under the same benefit. . . . For inpatient, . . . there is a $4,000 per calendar year maximum. That is for while he's in the hospital, that's the inpatient rehab.

On March 24, the family met with a care manager at Swedish Medical Center. The family told the care manager they were interested in the Acute Rehabilitation Unit (ARU) at Swedish where an inpatient receives "three hours of therapy a day, seven days a week." The care manager reiterated that the health care plan had a $4,000 limit for inpatient rehabilitation and discussed other options. But the family told the care manager they were "only interested in ARU at this time" and "may be willing to pay privately for ARU." The care manager suggested the family meet with ARU admission coordinator Meghan Trigg. The March 24 medical records state, in pertinent part:

> I spoke with pts [(patient's)] wife . . . , daughter . . . , and Son . . . in room about plan of care . . . . They would like pt. [(patient)] to go to ARU. I explained that pt. has a limited benefit [for rehabilitation] . . . . I will have ARU Coordinator, Meghan Trigg discuss with them. I will also give them SNF [(skilled nursing facility)] options but they really are only interested in ARU at this time. Wife . . . has discussed hiring PT/OT [(physical

---

[2] A mechanical embolectomy is a procedure intended "to restore blood flow in the neurovasculature by removing thrombus in patients experiencing ischemic stroke."

therapist/occupational therapist)] at home and . . . family may be willing to pay privately for ARU.

When Trigg met with the family to discuss inpatient rehabilitation, she also reiterated the Regence health care plan had a $4,000 limit and gave the family a benefits form. The benefits form states for "stay on the inpatient rehabilitation unit are: Covered at 80%. Limit $4000 per 12 months." Trigg discussed a number of other options with the family including using the benefit for a 30-day stay at a skilled nursing facility.[3] The March 24 medical records state, in pertinent part:

> Unfortunate situation in that patient has limited ARU benefit of $4000. Discussed this with the whole family today . . . . I gave them several options:
> 1.  They could have patient transfer to SNF and start therapy and work up to ARU in order to save some money. Patient could return to ARU when he is really able to maximize its benefit before returning home. This would allow him to return home with better function and be the least expensive.
> 2.  They could come to ARU and focus efforts and therapy on discharge to home with hospital bed, bedside commode, and wheelchair, this would shorten the stay, and get the patient home as quickly as possible. The family would then need to provide 24 hour care or hire help.
> 3.  They could come directly to ARU and stay until they are comfortable taking him home. This would be the most expensive option.

On March 25, one of the treating doctors, Dr. David Clawson, met with Pleasant and his family to discuss rehabilitation. Dr. Clawson recommended Pleasant use skilled nursing care and "reevaluate his progress in a month" before considering "bring[ing] him onto an acute rehabilitation service." The medical records state, in pertinent part:

> My understanding is that [Pleasant] has a limited rehabilitation benefit and I think in this early phase of his postacute care he would [be] best served in a subacute or skilled nursing setting. We can reevaluate

---

[3] The health care plan provides for 30 days of skilled nursing care:

SECTION 8.30    SKILLED NURSING FACILITY. Inpatient services and supplies by a skilled nursing facility will be provided for illness, accidental injury, or physical disability, limited to 30 days per Year.

3

his progress in a month, and then consider bring[ing] him onto an acute rehabilitation service with eventual hope of a community discharge.

Pleasant decided to use the skilled nursing benefit before using the limited rehabilitation benefit and "then pay privately at ARU when ARU benefit has been exhausted." The medical records for March 30 state, in pertinent part:

> Patient has 30 day SNF benefit under insurance policy whereay [sic] he has a $4000 ARU benefit (a little over 2 days). Per discussions with ARU Coordinator, Meghan Trigg, PT/OT, and Dr. Clawson, pt. should utilize SNF benefit first to strengthen [right] leg and then return to ARU (which has accepted him). Pt. will then pay privately at ARU when ARU benefit has been exhausted.

On April 5, Swedish discharged Pleasant to an inpatient skilled nursing facility, The Springs at Pacific Regent. Thirty days later, on May 5, the ARU admitted Pleasant as an inpatient for "rehabilitation." The ARU provides intensive rehabilitation therapy only to patients who are medically stable.

The medical records for May 5 state the inpatient ARU admission for Pleasant is "Physician Referral (Non-health Care Facility Point of Origin)," and the "Reason for Admission" is "for rehabilitation." The "Admission Type" is "Elective," the "Primary Service" is identified as "Rehab," and the "Secondary Service" is listed as "None." Pleasant left the ARU on May 31.

Regence paid approximately $250,000 for the inpatient hospital care Pleasant received at Swedish from March 18 until his discharge on April 5. Regence also paid for the one month of inpatient skilled nursing care at The Springs at Pacific Regent.

Under the terms of the health care plan, Regence paid only $4,000 for the rehabilitation expenses incurred while Pleasant was an inpatient at the ARU. Pleasant incurred approximately $138,000 in medical expenses while a rehabilitative inpatient at

4

the ARU—approximately $95,000 for rehabilitation and physical, occupational, and speech therapy, $25,600 for medications, and the remaining $17,400 for medical and surgical supplies and devices and laboratory tests.

Regence did not pay $415 for the mechanical embolectomy procedure. On July 8, 2010, Regence sent Pleasant a letter concerning denial of coverage for the mechanical embolectomy. Regence explained that under the "Regence Medical Policy Mechanical Embolectomy for Treatment of Acute Stroke" (Medical Policy), the procedure was excluded as "investigational" and provided a link to the Medical Policy posted on its website. The Medical Policy states, in pertinent part:

> Mechanical embolectomy is considered investigational in the treatment of acute stroke.
> . . . .
> The available published data are not sufficient to determine whether this approach improves health outcomes. . . . Given the lack of controlled studies to assess the impact of this treatment on outcome, the effectiveness of mechanical embolectomy for the management of acute stroke remains uncertain.

On February 9, 2011, Pleasant filed a lawsuit against Regence alleging breach of contract, bad faith, and violation of the Washington Consumer Protection Act (CPA), chapter 19.86 RCW, for refusing to pay for services and drugs he received while an inpatient at the ARU.

Pleasant filed a motion for summary judgment arguing he was entitled to payment for the medically necessary services and medications he received while a rehabilitative inpatient at the ARU. Pleasant relied on the provision of his health care plan that states when confined as an inpatient at a hospital, "[b]enefits will be provided for services and supplies . . . determined to be Medically Necessary." Pleasant also

submitted the declaration of Dr. Clawson. Dr. Clawson states that Pleasant received "medically necessary" care while at the ARU. The declaration states, in pertinent part:

> Mr. Pleasant received treatment while at the rehabilitation center. He received certain treatment which was medically necessary regardless of the setting in which he received the treatment. Examples include medication, laboratory work, and a CT[4] scan. Additionally, Mr. Pleasant underwent a procedure to remove and replace a blood filter. Again, these are treatments Mr. Pleasant received related to his stroke. The procedures, lab work and medicines were needed regardless of Mr. Pleasant's setting. In other words, Mr. Pleasant would have needed these treatments whether or not he had been admitted for in-patient rehabilitative services.

Regence filed a cross motion for summary judgment. Regence argued there was no dispute Pleasant was admitted to the ARU as an inpatient for rehabilitation and the health care plan expressly limited coverage for inpatient rehabilitation to $4,000.

In opposition, Pleasant argued there was a material issue of fact about whether Regence properly informed him of all of the benefit options under the plan. Pleasant also argued that Regence never produced evidence supporting denial of coverage for the mechanical embolectomy as an experimental or investigational procedure.

Regence moved to strike the claim that it improperly denied coverage for the mechanical embolectomy. Regence pointed out Pleasant raised the argument that the insurance policy covered the mechanical embolectomy procedure for the first time in opposition to summary judgment.

The court granted Regence's motion for summary judgment in part. The court ruled that under the terms of the health care plan, Pleasant was entitled to reimbursement of only $4,000 for inpatient rehabilitation at the ARU. The court also dismissed the claim that Regence did not fully inform Pleasant of his benefits and

---

4 (Computerized tomography.)

options under the health care contract. However, the court denied summary judgment on whether Regence properly denied coverage for the mechanical embolectomy. The "Order Granting In Part Regence's Motion for Summary Judgment" states, in pertinent part:

> a) Regence's policy with Mr. Pleasant caps claims for individuals in rehabilitative care and Regence properly enforced the terms of its contract for Mr. Pleasant's inpatient rehabilitation admission in May 2010; and
>
> b) Plaintiff's extra-contractual claims, based on allegations that Regence did not advise Mr. Pleasant to be discharged from the rehabilitation unit at an earlier time.
>
> The court DENIES summary judgment, without prejudice, on whether the denial of payment for mechanical embolectomy was proper since the court does not believe it has sufficient evidence in the record to make a determination of exactly when the treatment was provided and whether it is covered. Defendant proffered the argument that it should be dismissed because it was not pled in the complaint. As a notice pleading state, Plaintiff is not required to put the particular treatment at issue in order to be able to assert a breach of contract claim regarding that treatment.

Approximately two months later, the parties filed cross motions for summary judgment on whether Pleasant was entitled to payment of $415 for the mechanical embolectomy procedure. Pleasant argued the exclusion for an experimental or investigational procedure did not apply to the mechanical embolectomy. Regence argued the mechanical embolectomy procedure was investigational. In support, Regence submitted the declaration of Regence Medical Director Dr. Richard Rainey, the Medical Policy, and the medical studies and literature it relied on in determining the procedure was investigational. Dr. Rainey states that Regence periodically reviews and updates the Medical Policy on mechanical embolectomy "based on research, studies, medical literature, peer review publications, or other events occurring since the last review and update."

7

Pleasant moved to strike the Medical Policy, the medical studies and literature, and the declaration of Dr. Rainey. Pleasant argued Regence had not previously produced the Medical Policy and the medical literature or identified Dr. Rainey as a witness. In response, Regence asserted the Medical Policy was provided to Pleasant before he filed the lawsuit, and the medical studies and literature were produced in compliance with the court order extending the date to respond to discovery. Regence also asserted that the disclosure of possible primary witnesses reserved the right to include Dr. Rainey as a witness.

At the beginning of the hearing on the cross motions for summary judgment, the court denied Pleasant's request to exclude the Medical Policy, the medical studies and literature, and Dr. Rainey's declaration. The court granted Regence's motion for summary judgment dismissing the claim that Regence improperly denied coverage for the mechanical embolectomy procedure as well as "all remaining claims in this case . . . with prejudice."

## ANALYSIS

Pleasant contends the court erred in ruling the health care plan excludes coverage for medically necessary services and the medications he received while an inpatient at the ARU and the mechanical embolectomy procedure.[5]

We review summary judgment de novo. Smith v. Safeco Ins. Co., 150 Wn.2d 478, 483, 78 P.3d 1274 (2003). Summary judgment is appropriate if there is no genuine

---

[5] Below, Pleasant claimed the $4,000 limit for inpatient rehabilitative care violated public policy. In his brief on appeal, although Pleasant identifies as an issue whether the health care plan is void as against public policy, because he provides no argument or citation to authority, we do not consider this argument. See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (assignments of error unsupported by reference to the record or argument will not be considered on appeal).

8

issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). By filing cross motions for summary judgment, the parties concede there were no material issues of fact. <u>Tiger Oil Corp. v. Dep't of Licensing</u>, 88 Wn. App. 925, 930, 946 P.2d 1235 (1997).

Interpretation of an insurance contract is also a question of law that we review de novo. <u>Overton v. Consol. Ins. Co.</u>, 145 Wn.2d 417, 424, 38 P.3d 322 (2002); <u>Quadrant Corp. v. Am. States Ins. Co.</u>, 154 Wn.2d 165, 171, 110 P.3d 733 (2005). Because insurance policies are contracts, the principles of contract interpretation apply. <u>Quadrant</u>, 154 Wn.2d at 171. If the language in an insurance contract is not ambiguous, the court must enforce it as written and may not modify the contract or create an ambiguity where none exists. <u>State Farm Mut. Auto. Ins. Co. v. Ruiz</u>, 134 Wn.2d 713, 721, 952 P.2d 157 (1998). A provision is ambiguous if, on its face, it is fairly susceptible to more than one reasonable interpretation. <u>Quadrant</u>, 154 Wn.2d at 171.

The party seeking to establish coverage bears the initial burden of proving coverage under the policy has been triggered. <u>Diamaco, Inc. v. Aetna Cas. & Sur. Co.</u>, 97 Wn. App. 335, 337, 983 P.2d 707 (1999). The insurer bears the burden of establishing an exclusion to coverage. <u>Diamaco</u>, 97 Wn. App. at 337. We construe any ambiguity in an exclusion against the insurer. <u>McDonald v. State Farm Fire & Cas. Co.</u>, 119 Wn.2d 724, 733, 837 P.2d 1000 (1992).

<u>Inpatient Rehabilitation</u>

Pleasant contends the policy covers all medically necessary nonrehabilitative expenses he incurred while an inpatient at the ARU at Swedish, including x-rays, blood

draws, laboratory work, and medications. Regence argues the health care contract expressly limits the benefit Pleasant is entitled to receive as an inpatient admitted for rehabilitation. We agree.

The Regence individual health care plan provides benefits subject to specific limitations and exclusions. Article 8 defines benefits the insured is entitled to receive. Section 8.2 states Regence agrees to provide benefits for medically necessary services "subject to all limitations, exclusions, and provisions of this Contract."[6]

The "Limitations and Exclusions" section excludes treatment for rehabilitative care "including speech therapy, physical therapy, or occupational therapy, except as specified in the . . . Rehabilitative Benefits of Article 8." Article 6 provides, in pertinent part:

| | |
|---|---|
| **ARTICLE 6** | **LIMITATIONS AND EXCLUSIONS; WAITING PERIODS** |
| SECTION 6.1 | LIMITATIONS AND EXCLUSIONS. No Benefits will be provided for any of the following conditions, treatments, services, or supplies, or for any direct |

---

[6] Article 8 provides, in pertinent part:

| | |
|---|---|
| **ARTICLE 8** | **BENEFITS** |
| SECTION 8.1 | AGREEMENT TO PROVIDE BENEFITS. The Company agrees to provide coverage to the Member, while this Contract is in force, for the services of Preferred Plan and Participating Providers as specified in this Article that are within the scope of their practice. . . . |
| SECTION 8.2 | BENEFIT PROVISIONS. The Benefits of this Article for Medically Necessary services, will be provided at the payment levels specified in the Payment Schedule in the <u>Guide to Using Your Benefits</u>, subject to all limitations, exclusions, and provisions of this Contract. |
| . . . .<br>SECTION 8.5 | COVERED BENEFITS. The Benefits described in this Article will be provided at the payment level specified in the Payment Schedule in the <u>Guide to Using Your Benefits</u>. All Benefits are subject to the preadmission approval provision described in this Article, and to all conditions and limitations stated in the Benefit sections below or elsewhere in this Contract, as determined by the Company. All services and supplies must be Medically Necessary as defined in Article 1, except as provided in this Article for preventive care services. |

10

complications or consequences thereof, unless otherwise specified. . . .

. . . .

6.1.34     Treatment for rehabilitative care, including speech therapy, physical therapy, or occupational therapy, except as specified in the Home Health, Hospice, and Rehabilitation Benefits of Article 8.

Pleasant relies on Section 8.7, "Hospital . . . Inpatient Benefits," to argue he is entitled to coverage for all the medical expenses he incurred while at the ARU at Swedish. Section 8.7 states, in pertinent part:

SECTION 8.7     HOSPITAL FACILITY.
8.7.1     INPATIENT BENEFITS. When the Member is confined as an Inpatient, Benefits will be provided for services and supplies provided by a Hospital.

Regence relies on Section 8.29, "Inpatient Rehabilitation," to argue that under the terms of the policy, benefits are limited to $4,000 for the expense incurred while an inpatient at the ARU. Section 8.29 states, in pertinent part:

SECTION 8.29     REHABILITATION. The Benefits described below will be provided when Medically Necessary to restore and improve function that was previously normal but lost following a documented injury or illness:
8.29.1     INPATIENT. The Professional, Inpatient Hospital, and Skilled Nursing Facility Benefits of this Article will be provided to an Inpatient for an <u>Inpatient Rehabilitation Admission</u> for physical therapy, speech therapy, and occupational therapy, to a maximum of $4,000 per Year.[7]

The unambiguous terms of the health care plan and the undisputed record do not support Pleasant's argument that he was entitled to coverage for nonrehabilitative

---

[7] (Emphasis added.)

11

expenses he incurred while an inpatient at the ARU at Swedish.[8]  Contrary to Pleasant's argument, coverage under the terms of the Regence health care plan turns on his admission to the ARU for "Inpatient Rehabilitation."

The provision Pleasant relies on, Section 8.7.1, applies only when the Member is "confined" in the hospital as an "Inpatient."[9]  Section 1.13 defines "Inpatient" as "[a] person confined overnight in a Hospital or other facility as a regularly admitted bed patient to whom a charge for room and board is made in accordance with the Hospital's or facility's standard practice."[10]  By contrast, Section 1.14 defines an "Inpatient Rehabilitation Admission" as "[a]n inpatient admission to a Company approved facility specifically for the purpose of receiving speech, physical, or occupational therapy in an inpatient setting."

There is no dispute that Pleasant's admission was an inpatient rehabilitation admission.  After suffering a stroke on March 18, Pleasant was discharged from Swedish on April 5 to a skilled nursing care facility.  On May 5, Pleasant was admitted to the ARU for elective rehabilitation for physical, occupational, and speech therapy, not as a "regularly admitted" hospital inpatient.  Neither the medical records nor the declaration of Dr. Clawson suggest that the inpatient admission at the ARU was for any purpose other than rehabilitation.  The elective inpatient admission to the ARU was

---

[8] We grant Regence's motion to strike "Exhibit G," a map of Swedish Medical Center, because the document was not submitted below or considered by the trial court.  See RAP 9.12 (on review of order granting summary judgment, "appellate court will consider only evidence and issues called to the attention of the trial court").

[9] (Emphasis added.)

[10] There is no dispute that Swedish is a hospital facility.  Section 1.12 defines "hospital" as "[a]n accredited general Hospital that is a provider covered under this Contract."

"specifically for the purpose of receiving speech, physical, or occupational therapy in an inpatient setting."[11]

The two cases Pleasant relies on, <u>Dobias v. Service Life Insurance Co. of Omaha</u>, 469 N.W.2d 143 (Neb. 1991), and <u>National Family Care Life Insurance Co. v. Kuykandall</u>, 705 S.W.2d 267 (Tex. App. 1986), are distinguishable.

In <u>Dobias</u>, the insured's 18-year-old daughter fractured a vertebra when she was thrown from a truck. The spinal cord injury resulted in paralysis from the waist down and a number of serious complications. <u>Dobias</u>, 469 N.W.2d at 144. The daughter remained at Methodist Hospital in Omaha for 15 days following surgery. The doctors then transferred her to the rehabilitation center at Immanuel Medical Center to receive "24-hour acute nursing care and treatment for the complications from the spinal cord injury and paralysis." <u>Dobias</u>, 469 N.W.2d at 144.

The health insurance company paid for treatment at Methodist but denied the claim for care at Immanuel on the grounds that the policy did not provide coverage for rehabilitative care. <u>Dobias</u>, 469 N.W.2d at 144. The policy defined "hospital" to mean " 'a place which: . . . (b) is primarily engaged in providing medical, diagnostic, and major surgical facilities on its own premises . . . ; (c) has continuous 24-hour nursing services . . . ; [and] (d) has a staff of one or more doctors available at all times.' " <u>Dobias</u>, 469 N.W.2d at 144-45. The health insurance policy also expressly states that "hospital" does not mean "convalescent, nursing, rest, custodial, self-care, educational, or rehabilitative homes or units of hospitals used for such care." <u>Dobias</u>, 469 N.W.2d at 145.

---

[11] We note there are separate health care plan provisions addressing coverage for prescription drugs. Section 8.25.1 provides, "Benefits for Prescription Drugs as described below will be provided to an annual maximum of $2,000."

The insureds sued the health insurance company arguing the policy did not unambiguously exclude coverage for the care their daughter received at Immanuel. Dobias, 469 N.W.2d at 145. Following a trial, the court found that the definition of "hospital" excluded coverage for the care the daughter received at Immanuel. Dobias, 469 N.W.2d at 145.

On appeal, the court reversed. The court held that the evidence established the care the daughter received at Immanuel met the criteria for the definition of "hospital." Dobias, 469 N.W.2d at 146. The court concluded, in pertinent part:

> When [the daughter] was transferred to Immanuel, she was still in need of acute medical care in order to keep her alive. Any rehabilitative care which she received at Immanuel was incidental to the acute hospital care necessary to avoid the life-threatening complications she faced as a result of the spinal cord injury and paralysis. She received the services while she was a patient on a particular floor of a hospital which met the requirements of the hospital definition in the insurance policy. A hospital, by any other name, still provides acute medical care, and [the daughter] received acute medical care at Immanuel. It follows that Immanuel qualifies as a hospital under the policy definition.

Dobias, 469 N.W.2d at 146.

In Kuykandall, the insured was diagnosed with a pulmonary embolus and hospitalized in the ICU. Kuykandall, 705 S.W.2d at 269. After three days, the doctor transferred the insured from the ICU to a community hospital to continue to receive intensive care "in a like environment." Kuykandall, 705 S.W.2d at 269-70. The insurance company denied coverage for medical care the insured received at the community hospital in the coronary care unit (CCU). The health care policy excluded coverage for confinement in a CCU. Unlike an ICU, the policy did not define a CCU. Kuykandall, 705 S.W.2d at 269-70. A jury found the policy covered the expenses incurred at the CCU. Kuykandall, 705 S.W.2d at 269.

14

On appeal, the court noted the ambiguity in the policy and held that overwhelming evidence supported the jury verdict. Kuykandall, 705 S.W.2d at 270-71. The evidence showed the exclusion for care in a CCU applied only if it did not meet the standards for an ICU; that the intensive care the insured received at the CCU was " 'interchangeable' " with the care at the ICU; and based on the diagnosis, the hospital changed the billing to reflect ICU care. Kuykandall, 705 S.W.2d at 270.

Here, unlike in Dobias and Kuykandall, the health care plan is not ambiguous. The health care plan makes a clear distinction between benefits for a hospital inpatient and inpatient rehabilitation. Further, the record establishes that Pleasant was admitted to the ARU after his release from Swedish for treatment of his stroke and 30 days of care at a skilled nursing facility. Patients are admitted to the ARU for rehabilitation only if they are medically stable. The medical records establish his admission to the ARU was a "Physician Referral (Non-health care Facility Point of Origin)" and was "Elective." The "Primary Service" is identified as "Rehab" and the "Secondary Service" as "None."

Pleasant also argues Regence improperly denied coverage for the medications he received while at the ARU. Pleasant relies on Section 6.1.11 to argue he is entitled to coverage for the drugs he received as an inpatient at the ARU. The unambiguous terms of the health care plan do not support his argument. Section 6.1.11 states that the plan covers the cost of drugs "for the Inpatient who is receiving the Benefits . . . for that confinement, unless otherwise excluded under this Contract."[12]

---

[12] Section 6.1.11 provides, in pertinent part:

6.1.11     [No Benefits will be provided for] Drugs, except as follows:
           a.    Drugs will be provided for the Inpatient who is receiving the
                 Benefits of this Contract for that confinement, unless otherwise
                 excluded under this Contract.

(Emphasis added.)

15

We conclude the court did not err in concluding the health care plan limited the amount Pleasant was entitled to receive for inpatient rehabilitation at the ARU.

Mechanical Embolectomy

Pleasant also claims he is entitled to coverage for the mechanical embolectomy procedure. Pleasant argues Regence failed to meet its burden to show the mechanical embolectomy was an investigational procedure.

Consistent with the Washington Administrative Code (WAC), the individual health care plan addresses whether a procedure is investigational. See WAC 284-44-043(1) ("[e]very health care service contract . . . must include . . . a definition of experimental or investigational" services excluded under contract).[13] The WAC also requires the insurer to "establish a reasonable procedure under which denials of benefits or refusals to preauthorize services because of an experimental or investigational exclusion or limitation may be appealed." WAC 284-44-043(4)(a).[14]

Here, the health care plan excludes coverage for "investigational services or supplies." The health care plan defines "Investigational Service or Supply" and the criteria to determine whether a procedure is "investigational." Section 1.15 states:

> SECTION 1.15    INVESTIGATIONAL SERVICE OR SUPPLY: A service or supply (including but not limited to drugs, devices, and other items) that is determined by the Company to meet any one of the following:

---

[13] WAC 284-44-043(2) states, in pertinent part:

The definition of experimental or investigational services must include an identification of the authority or authorities which will make a determination of which services will be considered to be experimental or investigational. If the health care service contractor specifies that it, or an affiliated entity, is the authority making the determination, the criteria it will utilize to determine whether a service is experimental or investigational must be set forth in the contract and any certificate of coverage issued thereunder.

[14] The health care plan provides an appeal process for denial of coverage based on a determination that the procedure is investigational. There is no dispute that Pleasant did not appeal the determination that the mechanical embolectomy was investigational.

16

1.15.1     Any service or supply classified as experimental and/or investigational by the national Blue Cross Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, as adopted by the Company. The national Blue Cross Blue Shield Association's determination is based on the following criteria:

    a.     The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes (which means significant measurable improvement in length of life, ability to function, or quality of life);

    b.     The technology must improve the net health outcome (as defined above);

    c.     The technology must be as beneficial as any established alternatives;

    d.     The improvement must be attainable outside the laboratory or clinical research setting; and

    e.     Items must have been approved by the U.S. Food and Drug Administration (FDA) as being safe and efficacious for general marketing, and permission must have been granted by the FDA for commercial distribution; or

1.15.2     Any service or supply classified as experimental or investigational by the Company. The Company's determination is based on the criteria specified under Paragraph 1.15.1.

Pleasant ignores both the WAC and the language of his individual health care plan. The health care plan complies with WAC 284-44-043 by setting forth the criteria Regence uses to determine whether a procedure is investigational. The Medical Policy describes the studies Regence relied on to determine a mechanical embolectomy used

17

to treat acute stroke is investigational.[15] Regence also produced as evidence the medical studies it relied on in making that determination.

In the alternative, Pleasant claims Regence violated the CPA and acted in bad faith by failing to provide any reasonable explanation supporting the basis for denial of the mechanical embolectomy procedure. "[A] reasonable basis for denial of an insured's claim constitutes a complete defense to any claim that the insurer acted in bad faith or in violation of the Consumer Protection Act." Dombrosky v. Farmers Ins. Co. of Wash., 84 Wn. App. 245, 260, 928 P.2d 1127 (1996).

Here, Regence sent Pleasant an "Explanation of Benefits" and a follow-up letter explaining why it considered the mechanical embolectomy to be investigational. The July 8, 2010 letter explaining its denial of coverage for the mechanical embolectomy states, in pertinent part:

> Our Regence Medical Policy Mechanical Embolectomy for Treatment of Acute Stroke, Surgery 158, considers the above service(s) to be investigational. Your member contract includes a definition for investigational services or supplies. The contract also outlines that your health plan excludes coverage for investigational services[ or] supplies. . . . Coverage of the requested service is denied because Regence Medical Policy considers this service to be investigational. The published clinical evidence is insufficient to conclude that mechanical embolectomy improves health outcomes of patients with acute stroke. The Regence Medical Policy detailing the rationale for this determination is published at http://blue.regence.com/trgmedpol/surgery/sur158.html. If you disagree with our decision, you have the right to request a review either verbally or in writing.

---

[15] Pleasant also argues the court erred in denying his motion to exclude the Medical Policy, the medical studies, and Dr. Rainey's declaration. Pleasant cites King County Local Civil Rule 26(k)(4) requiring exclusion of witness testimony "not disclosed in compliance with this rule." But the undisputed record shows Regence provided Pleasant with the Medical Policy, produced the medical studies in compliance with a court order extending the date to respond to discovery, and that Regence was entitled to submit Dr. Rainey's declaration. We also note that in his declaration, Dr. Rainey largely restates information from the health care plan or the Medical Policy.

We conclude Regence complied with the requirements of WAC 284-44-043 and provided a reasonable basis for denial of the claim for the mechanical embolectomy. Reasonable minds could not differ that its denial of coverage was based upon reasonable grounds. Smith, 150 Wn.2d at 486.

We affirm summary judgment dismissal of the lawsuit against Regence.

WE CONCUR: