IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE SPOT ON EVERGREEN III, INC. | ) | No. 80210-1-I |
| (d/b/a THE SPOT ON EVERGREEN), | ) | |
| a limited liability company incorporated | ) | |
| in Washington, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| THE WASHINGTON STATE LIQUOR | ) | |
| AND CANNABIS BOARD, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

SMITH, J. — The Washington State Liquor and Cannabis Board (Board) appeals the superior court's order reversing the Board's denial of an application for a marijuana retail license in Mukilteo submitted by The Spot on Evergreen III Inc. (Spot). The Board denied Spot's application because it had allocated the last license available in Mukilteo to another applicant, Rengar LLC. The Board contends that contrary to the superior court's determination, the Board properly determined that Traxx Indoor Raceway and the Mukilteo YMCA, both located within 1,000 feet of Rengar's location, were not restricted entities under the Board's regulations. The Board also contends that the superior court erred by determining that the Board's decision to allocate the license to Rengar was arbitrary and capricious.

We agree with the Board. Thus, we reverse the superior court and

reinstate the order of the Board denying Spot's application for a marijuana retail license in Mukilteo.

## BACKGROUND

In Washington State, only a limited number of marijuana retail licenses are issued in each jurisdiction. RCW 69.50.345(2). The Board determines the maximum number of marijuana retail locations per jurisdiction based on estimated consumption data and population data from the state Office of Financial Management. RCW 69.50.345(2).

In 2015, the legislature merged Washington's medical and recreational marijuana systems and directed the Board to make additional retail licenses available to address the needs of the medical market. See LAWS OF 2015, ch. 70, §§ 2, 8. It is undisputed that as a result, the maximum number of marijuana retail licenses for the city of Mukilteo was increased from one to two.

As part of the 2015 legislation, the Board was directed to "develop a competitive, merit-based application process" for marijuana retail licensure. Former RCW 69.50.331(1)(a) (LAWS OF 2015, ch. 70, § 6(1)(a)).[1] According to the declaration of Nicola Reid, the compliance and policy manager for the Board's Licensing and Regulation Division (Licensing), "[t]here were usually far more applicants for the licenses than there were spaces available." Accordingly, "the applicants would be competing to see who would be able to secure the

---

[1] This licensing scheme was later eliminated after the merger of the two systems was completed and additional retail outlets licensed. See LAWS OF 2017, ch. 317, § 2; see also FINAL B. REP. ON ENGROSSED SUBSTITUTE S.B. 5131, 65th Leg., Reg. Sess. (Wash. 2017).

licenses." Also according to Reid, Licensing would process applications "in the order that they were able to submit the necessary documentation." Reid explained that "[t]his meant that the applicants who were more prepared, and who could most quickly provide the necessary documentation would be the first to be allocated a spot in the jurisdiction." Also according to Reid, "[t]he spot would be allocated as soon as the applicants made it through to the final step of the licensing process: the final inspection of the physical location by . . . Board Enforcement Officers." Thus, Reid explained, "applicants were . . . trying to be the first to complete the licensing process up to the final inspection in order to secure a spot in the jurisdiction." "If the applicant failed the inspection, they would lose the allocation and be sent back to the licensing process again." If that occurred, it "would allow another applicant to have a chance to secure one of the allocations."

Spot applied for a marijuana retail license in 2016 and, in November 2017, moved its application to Mukilteo. It is undisputed that at that time, Mukilteo had only one marijuana retail license allotment remaining. It also is undisputed that Rengar was competing with Spot for that final allotment. In December 2017, after it became clear that there were more applicants than licenses available for Mukilteo, Licensing sent Spot a letter asking Spot to indicate whether it wished to proceed in Mukilteo. Spot did not respond to this letter until February 22, 2018.

On March 5, 2018, Licensing determined that Rengar had completed the application process. Licensing thus moved Rengar forward to final inspection and allocated the last remaining marijuana retail license in Mukilteo to Rengar.

Rengar passed its final inspection on March 13, 2018, and was ultimately licensed on May 9, 2018.

Meanwhile, Licensing notified Spot that Mukilteo had met its allotment of retail licenses and offered Spot an opportunity to find another location (other than Mukilteo) to proceed with its application. After Spot indicated that it wished to appeal Licensing's determination, Licensing issued a "Statement of Intent to Deny Proposed Location in the City of Mukilteo" setting forth its reasons for seeking denial of Spot's application.

On April 6, 2018, Spot requested an adjudicative proceeding and a hearing before an administrative law judge (ALJ). In mid-September, both Licensing and Spot moved for summary judgment before the ALJ. In Spot's motion, Spot argued that Rengar's proposed site was within 1,000 feet of three restricted entities: (1) Traxx Indoor Racing (Traxx), which Spot contended was a "game arcade" under WAC 314-55-010(11); (2) a 13-acre, City-owned property that the Boys and Girls Club "is developing into use for minors"; and (3) the Mukilteo YMCA, which Spot contended was a "recreation center" under WAC 314-55-010(27). Spot argued that because the Board's regulations prohibited issuing a license to Rengar due to its proximity to these entities, the Board would violate its obligation to conduct a "'comprehensive, fair, and impartial'" evaluation by denying Spot's application based on a decision to allocate the final remaining license in Mukilteo to Rengar. Meanwhile, Licensing argued that (1) Traxx primarily featured go-karts and thus was not a "game arcade," (2) the YMCA was not a "recreation center" because it was not intended

4

primarily for use by people under the age of 21, and (3) although the Boys and Girls Club *planned* to build facilities on the city's 13-acre property, they had not yet been constructed and, thus, the property did not qualify as a restricted entity.

On October 22, 2018, the ALJ entered an initial order in which she determined that (1) Traxx was not a "game arcade," (2) the YMCA "is not intended primarily for use by persons under the age of 21" and instead "is primarily used by adults taking exercise classes," and (3) the Boys and Girls Club ballfield "has not yet been built and wasn't built at the time [Licensing] moved Rengar forward for final inspection, nor at the time its license was issued." The ALJ granted Licensing's motion for summary judgment and denied Spot's motion.

On November 30, 2018, Spot petitioned the Board for review of the ALJ's initial order.[2] In its petition for review, Spot renewed its arguments about Traxx but did not rebrief its arguments regarding the YMCA or the future Boys and Girls Club park. It did, however, raise a new argument about the alleged mobility of Rengar's proposed location. Specifically, Spot contended that Rengar's building was mobile (and thus not licensable) because it had a trailer hitch and wheels attached to it. In support of this contention, Spot relied on a March 12, 2018, e-mail from Jody Boranian, a Spot principal, to a city of Mukilteo planning manager. In that e-mail, on which licensing investigator Michael Roe was copied, Boranian

---

[2] Under WAC 314-42-095(2)(a), a petition for review with the Board must be filed within 20 days after the date of service of the initial order. Here, Spot initially moved for reconsideration of the ALJ's initial order and the ALJ denied reconsideration because the relevant statutes and WACs "provide for motions to reconsider for final orders only." After realizing its error, Spot filed a petition for review after the close of the 20-day period, citing exigent circumstances.

notified the city planning manager that Rengar's building was a "temporary mobile structure." Roe forwarded the e-mail to others in Licensing the same day and noted, "It looks like the hitch is still hooked up to the modular trailer so I'm not sure if this was caught prior." Spot also relied on another March 12, 2018, e-mail from Mistie Jones, a licensing specialist supervisor, to others in Licensing, in which Jones wrote:

> I just spoke with [Spot] . . . which is not able to proceed since your application for [Rengar] just went to inspection and took the last allotment in Mukilteo. [Spot] had several complaints about [Rengar] but the one that might be an issue is the fact [Spot] states it's a mobile building with a trailer hitch hooked up to it, so it can be hooked up and towed away at any time. I didn't see any pictures before it went to inspection so this might be something to look into. I don't believe we are moving forward with licensing those types of buildings any longer because of the fact they can be moved at any time.

Finally, Spot relied on photographs of Rengar's building taken on October 27, 2018, by Spot's attorney, purporting to show a trailer hitch and wheels still attached to the structure. The March 12, 2018, e-mails and the photographs were not previously made a part of the record before the ALJ.

In its response to Spot's petition, Licensing argued, among other things, that the Board should decline to consider new evidence and arguments that were not before the ALJ, including Spot's argument about the mobility of Rengar's building. Licensing argued further that even if the trailer hitch argument were considered, it should be rejected because (1) Licensing did not overlook the hitch and wheels but instead made a determination that they were not an issue and (2) the mere presence of a trailer hitch would not, in any event, preclude licensure. In support of its argument, Licensing submitted a declaration from Frank O'Dell, a

Board administrative regulations analyst, in which he declared, "I participated in discussions regarding Rengar, LLC in which it was determined that a trailer hitch present on the building at the time of the final inspection would not prevent issuance of a license." Attached to O'Dell's declaration was a March 13, 2018, e-mail in which O'Dell informed Roe that Lauren Ware, the licensing investigator for the Rengar application, "is aware of the complaint and to date there is no concern. Lauren will communicate with the E[nforcement] O[fficer] to ensure the modular building is not mobile (off the tires/track and tongue secured so they could not just back up and drive away)."

On January 2, 2019, the Board entered a final order affirming and adopting the ALJ's initial order. In its final order, the Board also denied Spot's license application.

On January 29, 2019, Spot petitioned the superior court for review of the Board's final order. The superior court concluded, as relevant here, that Spot was entitled to relief under RCW 34.05.570(3)(d) because the Board erroneously interpreted the law:

> Per RCW 34.05.570(3)(d), [the Board] erroneously interpreted the law when it found that a go-kart track, Traxx, does not qualify as a "game arcade," as defined in WAC 314-55-010(12).
> . . . [The Board] also erroneously interpreted the law when it found that the Mukilteo YMCA does not qualify as a "recreational facility" as defined in WAC 314-55-010(35).

The superior court also concluded that Spot was entitled to relief under RCW 34.05.570(3)(i) because the Board's order was arbitrary and capricious:

> Per RCW 34.05.570(3)(i), [the Board]'s actions were arbitrary and capricious when it licensed a moveable premise, with wheels and a trailer hitch, contrary to [Board] policy.

7

> . . . Per RCW 34.05.570(3)(i), [the Board]'s actions were arbitrary and capricious when it disregarded the proximity of Rengar to the proposed location of ballfields that the Boys and Girls Club had been approved to build.

The superior court granted Spot's petition for judicial review, reversed the Board's final order, and ordered that Spot's "application is hereby reinstated with . . . Licensing . . . for processing of [Spot]'s retail marijuana license application." The Board appeals.

ANALYSIS

The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs this court's review of the Board's final order. Top Cat Enters., LLC v. City of Arlington, ___ Wn. App. 2d ___, 455 P.3d 225, 229 (2020). "This court sits in the same position as the superior court, applying the standards of the APA directly to the record before the agency." Top Cat, 455 P.3d at 229. "'The burden of demonstrating the invalidity of agency action is on the party asserting invalidity.'" Top Cat, 455 P.3d at 229 (quoting RCW 34.05.570(1)(a)). Although Spot correctly points out that this court views the facts in the light most favorable to the nonmoving party when the ALJ's original decision was on summary judgment, where, as here, the parties cross-moved for summary judgment, they conceded that there were no material issues of fact. Pleasant v. Regence BlueShield, 181 Wn. App. 252, 261, 325 P.3d 237 (2014).

A court may grant relief from an agency order in an adjudicative proceeding only in certain statutorily enumerated circumstances. RCW 34.05.570(3). As relevant here, a court may grant relief if it determines that "[t]he agency has erroneously interpreted or applied the law" or that "[t]he order is

8

arbitrary or capricious." RCW 34.05.570(3)(d), (i). Each of these grounds for relief is separately discussed below.

<u>Erroneous Interpretation or Application of the Law</u>

"We interpret agency regulations as if they were statutes and review [the Board]'s legal determinations de novo." <u>Top Cat</u>, 455 P.3d at 229. "We give substantial weight, however, to an agency's interpretation of statutes and regulations within its area of expertise." <u>Top Cat</u>, 455 P.3d at 229. "'Accordingly, we will uphold an agency's interpretation of a regulation if it reflects a plausible construction of the statutory language and is not contrary to the legislature's intent and purpose.'" <u>Top Cat</u>, 455 P.3d at 229 (quoting <u>Wash. Cedar & Supply Co. v. Dep't of Labor & Indus.</u>, 137 Wn. App. 592, 598, 154 P.3d 287 (2007)). That said, "'[i]f a regulation is unambiguous, . . . we will not look beyond the plain meaning of the words in the regulation.'" <u>Top Cat</u>, 455 P.3d at 229 (quoting <u>Mader v. Health Care Auth.</u>, 149 Wn.2d 458, 473, 70 P.3d 931 (2003)). "Regulatory definitions apply[,] and any undefined terms are given their ordinary definition as defined in the dictionary." <u>Dep't of Labor & Indus. v. Tyson Foods, Inc.</u>, 143 Wn. App. 576, 582, 178 P.3d 1070 (2008). An agency's application of law to facts is a question of law reviewed de novo. <u>Yow v. Dep't of Health Unlicensed Practice Program</u>, 147 Wn. App. 807, 818, 199 P.3d 417 (2008).

Here, the Board contends that it did not erroneously interpret or apply the law in determining that (1) Traxx is not a "game arcade" and (2) the Mukilteo YMCA is not a "recreation center or facility." For the reasons discussed below, we agree.

9

*Traxx*

The Board may not issue a new marijuana license to a business situated within 1,000 feet of "[a]ny game arcade (where admission is not restricted to persons age twenty-one or older)." WAC 314-55-050(10)(h).[3]  Here, it is undisputed that Rengar's proposed location was within 1,000 feet of Traxx and that admission to Traxx was not restricted to persons 21 years of age or older.  Accordingly, the only question before us is whether the Board erred by determining that Traxx was not a "game arcade."

The Board's regulations define "game arcade" as "an entertainment venue featuring primarily video games, simulators, and/or other amusement devices where persons under twenty-one years of age are not restricted."  WAC 314-55-010(12).[4]  Spot does not dispute that Traxx features primarily go-karts, but it contends that go-karts are either "simulators" or "amusement devices."  We disagree.

The regulations do not define "simulators."  However, the parties are in agreement that the dictionary definition of "simulator" is "a device that enables the operator to reproduce or represent under test conditions phenomena likely to occur in actual performance."  MERRIAM WEBSTER, https://merriam-webster.com/dictionary/simulator (last visited March 23, 2020).  To this end, the Board contends that a go-kart is not a "simulator" because "[r]acing a go-kart is

---

[3] WAC 314-55-050(10) was amended in 2018 to add exceptions that are not relevant to this appeal.  Accordingly, we cite to the current version of that regulation, and its subsections, throughout this opinion.

[4] The definition of "game arcade" was renumbered, without amendment, in 2016 and again in 2018.  We cite to the current version.

not a representation or reproduction of any kind of performance or condition – it *is* racing a go-kart." Meanwhile, Spot contends that the Board's argument that a go-kart is not a simulator is "absurd" because "[a] go-kart literally simulates the activity of driving." But driving a go-kart is just that: driving a go-kart. Even though a go-kart is typically driven on a closed course, driving a go-kart does not simulate driving a car any more than racing NASCAR[5] does. Therefore, we conclude that applying the plain meaning of "simulator," a go-kart is not a simulator.

Turning next to whether a go-kart is an "amusement device," the dictionary does not provide a definition for the phrase "amusement device." Thus, it is unclear from the plain language of WAC 314-55-010(12) whether a go-kart is an "amusement device." Accordingly, we will uphold the Board's interpretation so long as it constitutes a plausible construction of the regulation and is not contrary to the legislature's intent and purpose. See Bayley Constr. v. Dep't of Labor & Indus., 10 Wn. App. 2d 768, 793-94, 450 P.3d 647 (2019) ("[W]e accord substantial weight to an agency's interpretation within its area of expertise and uphold that interpretation if it reflects a plausible construction of the regulation and is not contrary to legislative intent."), review denied, No. 97867-1 (Wash. Mar. 4, 2020).

To this end, the Board points out that under the maxim of ejusdem generis, "general words accompanied by specific words are construed to embrace only similar objects." State v. Van Woerden, 93 Wn. App. 110, 117,

_____

[5] National Association for Stock Car Auto Racing.

967 P.2d 14 (1998). Thus, the Board argues, the phrase "other amusement devices" in WAC 314-55-010(12) must be read to embrace only objects similar to video games and simulators. The Board contends further that unlike "something like a pinball machine that may be found in a game arcade," a go-kart is not similar to a video game or a simulator and, thus, is not an "amusement device" within the meaning of WAC 314-55-10(12).

The Board's reading of "other amusement devices" is a plausible one. As the Board points out, unlike other devices that one would normally expect to encounter in an arcade, a go-kart is not similar to a video game or a simulator. Furthermore, Spot does not point to any statute or other expression of legislative intent with which the Board's interpretation would conflict. Cf. Dep't of Labor & Indus. v. Granger, 159 Wn.2d 752, 764-65, 153 P.3d 839 (2007) (declining to defer to agency where agency's construction could not be reconciled with statutory mandate that industrial insurance act be liberally construed). Therefore, we conclude that a go-kart is not an "amusement device."

Spot disagrees and contends that a go-kart is plainly an "amusement device" because it is "a device designed for the sole purpose of entertainment." But WAC 314-55-010(12) does not refer to "amusement devices" *generically*; rather, it defines "game arcade" in terms of "video games, simulators, and/or *other* amusement devices." (Emphasis added.) And as the Board points out, "[u]nder Spot's interpretation, the amusement device tail would wag the game arcade dog" such that the term "amusement device" would render the terms "video games" and "simulators" superfluous. Therefore, Spot's argument is

unpersuasive.

Spot next points out that Traxx features some video games. Spot then relies on the regulation's use of "and/or" before the phrase "other amusement devices" to argue that "a location can be a game arcade if it has video games *or* simulators *or* other amusement devices." But Spot's argument ignores the regulation's use of the word "primarily": "'Game arcade' means an entertainment venue featuring *primarily* video games, simulators, and/or other amusement devices." WAC 314-55-010(12). Therefore, Spot's argument fails.

Spot also points to the definition of "amusement device" adopted by the city of Mukilteo to support its interpretation of that phrase. But Spot offers no authority for the proposition that a municipal code is relevant to this court's interpretation of a state agency's regulation. Thus, Spot's reliance on Mukilteo's municipal code is misplaced.

Finally, Spot asserts that the Board's interpretation of the term "game arcade" is in conflict with "the Washington legislature's intent to protect the state's youth." Spot relies on State v. Jimenez, 200 Wn. App. 48, 401 P.3d 313 (2017), in support of its assertion. But the Jimenez court was not interpreting a marijuana licensing statute; it was interpreting a statute criminalizing the possession of marijuana by minors. Jimenez, 200 Wn. App. at 51. Therefore, Jimenez is inapposite here. Spot also relies on legislative findings that appear in an official note following RCW 69.50.325 and, in particular, a sentence stating, "[T]he legislature finds that the state has a substantial and compelling interest in enacting this act aimed at protecting Washington's children, youth, and young

adults." See LAWS OF 2017, ch. 317, § 12. But those findings accompanied 2017 amendments that did not change the statutes defining restricted entities and establishing minimum distances therefrom. See LAWS OF 2017, ch. 317, § 2. Thus, the 2017 legislative findings are not persuasive. See Brenner v. Leake, 46 Wn. App. 852, 854, 732 P.2d 1031 (1987) ("The function of the court in construing legislation is to ascertain legislative intent *at the time of enactment of the statute*." (emphasis added)).

We conclude that a go-kart is neither a "simulator" nor an "amusement device" within the meaning of WAC 314-55-010(12) and, thus, the Board did not erroneously interpret or apply the law in determining that Traxx, which primarily features go-karts, is not a "game arcade."

*YMCA*

The Board's regulations also prohibit the Board from issuing a new marijuana license if the proposed licensed business is within 1,000 feet of a "[r]ecreation center or facility." WAC 314-55-050(10)(c). Here, it is undisputed that Rengar's proposed location was within 1,000 feet of the Mukilteo YMCA, which Spot argues is a recreation center within the meaning of the regulations. We disagree.

As an initial matter, the Board contends that because Spot raised the YMCA issue before the ALJ but did not rebrief it in its petition for review to the Board, Spot failed to exhaust its administrative remedies with regard to the YMCA. Because a petition for review to the Board must "[s]pecify the portions of the initial order to which exception is taken," WAC 314-42-095(2)(a)(i), and

"[i]ssues not raised before the agency may not be raised on appeal," RCW 34.05.554, this argument has some merit. But unlike other agencies whose regulations provide that issues not specifically raised in a petition are waived,[6] the Board's regulations do not so provide. Furthermore, Spot fully raised and argued the YMCA issue before the ALJ, and the Board cites no authority to support its apparent contention that this did not constitute raising the issue "before the agency" as contemplated by RCW 34.05.554. Cf. ZDI Gaming, Inc. v. Wash. State Gambling Comm'n, 151 Wn. App. 788, 811, 214 P.3d 938 (2009) (declining to review issue that *neither* the ALJ nor the agency considered and that was raised for the first time on judicial review), aff'd, 173 Wn.2d 608, 268 P.3d 929 (2012). Finally, South Hollywood Hills Citizens Ass'n v. King County, 101 Wn.2d 68, 677 P.2d 114 (1984), the case on which the Board chiefly relies to argue that Spot waived its YMCA argument, is distinguishable. There, the party challenging the county's action failed entirely to appeal a hearing examiner's initial recommendation. See S. Hollywood Hills Citizens Ass'n, 101 Wn.2d at 72. But here, Spot *did* seek the Board's review of the ALJ's initial order, even if Spot did not rebrief all issues. For these reasons, we reject the Board's exhaustion argument and reach the merits of the YMCA issue.

Turning to the merits of that issue, a recreation center is, as relevant here,

---

[6] See, e.g., WAC 263-12-145(4) (providing, with regard to Board of Industrial Insurance Appeals, that "[a] party filing a petition for review waives all objections or irregularities not specifically set forth therein"); WAC 139-03-075 (providing, with regard to the Criminal Justice Training Commission, that "[a] petition for review shall set forth in detail the grounds for review and the party filing the petition shall be deemed to have waived all objections or claims of irregularities not specifically set forth therein.").

15

"a supervised center that provides a broad range of activities and events intended primarily for use by persons under twenty-one years of age, owned and/or managed by a charitable nonprofit organization."  WAC 314-55-010(35).[7] Under the plain language of this regulation, a facility is not a recreation center unless it is "intended primarily for use by persons under twenty-one years of age."

Here, the undisputed facts presented to the ALJ were that although the YMCA offered some activities and events for children, the facility itself was not intended primarily for use by people under 21 years of age.  Instead, it was open to all and, indeed, most of its activities focused either in part or entirely on adults.  Accordingly, the Board, which adopted the ALJ's determination on this issue, did not err by concluding as a matter of law that the YMCA was not a "recreation center or facility."

Spot disagrees and contends that under WAC 314-55-010(35), "the location itself need not be primarily for those under twenty-one, but rather that it offers a broad range of activities primarily for youths, regardless of the other activities it offers."  Put another way, Spot contends that in WAC 314-55-010(35), the phrase "intended primarily for use by persons under twenty-one years of age" modifies "activities and events" rather than "center."  Thus, Spot contends, so long as a center offers a broad range of activities and events for children, it is a "recreation center" regardless whether the facility *itself* is intended primarily for

_____

[7] This definition was renumbered in 2016 and amended in 2018.  Because these amendments do not affect the issues in this appeal, we cite to the current version of the regulation.

children. Spot's contention fails for two reasons.

First, Spot ignores the word "use" in WAC 314-55-010(35). Because one does not "use" an activity or event but *does* "use" a center, it is clear that the phrase "intended primarily for use by persons under twenty-one years of age" modifies "center" and not "activities and events." In re Forfeiture of One 1970 Chevrolet Chevelle, 166 Wn.2d 834, 838-39, 215 P.3d 166 (2009) (court applies ordinary meaning of words, basic rules of grammar, and statutory context to discern plain meaning).

Second, Spot's contention makes the regulation, at most, ambiguous. And to the extent that the regulation is ambiguous, we defer to the Board's interpretation so long as it is plausible and not in conflict with legislative intent. To that end, the Board's interpretation of the phrase "intended primarily for use by persons under twenty-one years of age" as modifying "center," and thus referring to the YMCA itself, is plausible. Furthermore, Spot's arguments that the Board's interpretation is in conflict with legislative intent rely again on Jimenez and the legislature's 2017 findings, which, as already discussed, are not persuasive here. Therefore, Spot's contention fails, and we conclude that the Board did not err when it concluded that the Mukilteo YMCA is not a "recreation center or facility."

Arbitrary or Capricious Order

Turning next to the parties' arguments regarding whether the Board's order was arbitrary or capricious, "[a]n agency's decision is arbitrary and capricious only if it 'is willful and unreasoning and taken without regard to the

attending facts or circumstances.'" ZDI Gaming, 151 Wn. App. at 806 (internal quotation marks omitted) (quoting Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n, 149 Wn.2d 17, 26, 65 P.3d 319 (2003)). "The arbitrary and capricious standard is very narrow and, as with other challenges to agency action, the party asserting it bears a heavy burden." ZDI Gaming, 151 Wn. App. at 806. "'Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" Linville v. Dep't of Ret. Sys., 11 Wn. App. 2d 316, 327, 452 P.3d 1269 (2019) (quoting Pub. Util. Dist. No. 2 of Pac. County v. Comcast of Wash. IV, Inc., 184 Wn. App. 24, 45, 336 P.3d 65 (2014)).

Here, the Board argues that it did not act arbitrarily or capriciously with regard to its consideration of the future Boys and Girls Club park and the alleged mobility of Rengar's location. As further discussed below, we agree.

*Boys and Girls Club Park*

Spot argued below, and the superior court agreed, that the Board acted arbitrarily and capriciously by disregarding Rengar's proximity to a 13-acre, city-owned property (Future Park Property) on which the Boys and Girls Club planned to build a park. We conclude that the superior court erred in this regard.

As an initial matter, the Board argues that Spot failed to exhaust its administrative remedies with regard to the park argument by failing to rebrief it in its petition for review to the Board. But the park argument was fully considered by the ALJ, and thus, we reject the Board's exhaustion argument for the reasons discussed above in the context of Spot's YMCA argument.

18

Turning to the merits of the park argument, under WAC 314-55-050(10), the Board generally may not issue a license to a business within 1,000 feet of a public park. "'Public park' means an area of land for the enjoyment of the public, *having facilities for rest and/or recreation,* such as a baseball diamond or basketball court, owned and/or managed by a city, county, state, federal government, or metropolitan park district." WAC 314-55-010(33) (emphasis added).[8]

Here, although the record establishes that the Boys and Girls Club planned to build a park, including recreation facilities, on the Future Park Property, the record also indicates that completion was not anticipated until 2019. Indeed, even the superior court found only that "[t]he Boys and Girls Club *has agreed* with the City of Mukilteo *to construct* playfields within 1000 feet of Rengar's premise." (Emphasis added.) Reasonable minds can, at the very least, differ about whether a yet-to-be-completed park is a "public park." Furthermore, this issue was argued before the ALJ and addressed in detail in the ALJ's initial order, later adopted by the Board. Thus, Spot does not satisfy its burden to show that the Board acted arbitrarily or capriciously in affirming the ALJ in this regard. See Karanjah v. Dep't of Soc. & Health Servs., 199 Wn. App. 903, 925, 401 P.3d 381 (2017) ("'Action taken after giving . . . ample opportunity to be heard, exercised honestly and upon due consideration, even though it may be believed an erroneous decision has been reached, is not arbitrary or

---

[8] The definition of "public park" was renumbered, without amendment, in 2016 and again in 2018. We cite to the current version.

capricious.'" (internal quotation marks omitted) (quoting <u>Heinmiller v. Dep't of Health</u>, 127 Wn.2d 595, 609-10, 903 P.2d 433, 909 P.2d 1294 (1995))).

Spot contends that the Board acted arbitrarily and capriciously because it ignored evidence that the park was already in existence at the time that it processed Rengar's license. In support of this contention, Spot points to the Board's "Report of Application" for Rengar, to which was attached aerial images showing an existing ballfield and track. But those existing facilities are not situated on the Future Park Property; they are on a different property.[9] And Spot points to no evidence that the property on which the existing facilities are situated is within 1,000 feet of Rengar's location. Therefore, Spot's contention fails.

*Mobility of Rengar's Proposed Location*

Spot also argued below, and the superior court again agreed, that the Board acted arbitrarily and capriciously when it "licensed a moveable premise, with wheels and a trailer hitch, contrary to [Board] policy." This, too, was error.

As an initial matter, the Board points out that Spot did not raise the mobility argument before the ALJ and instead raised it for the first time before the Board. But the Board does not argue that Spot's failure to raise the issue before the ALJ precludes this court's review, and thus, we reach the merits of the mobility argument. <u>Cf.</u> <u>Holland v. City of Tacoma</u>, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.").

---

[9] This is readily apparent if one compares page 324 of the administrative record, depicting the Future Park Property, with page 391 of the administrative record, depicting the existing facilities.

20

Spot's argument is, in essence, that (1) the Board had an established policy of not licensing mobile locations, as demonstrated by Licensing's internal e-mails; and (2) the Board acted arbitrarily and capriciously when it—and specifically Licensing—disregarded that policy with regard to Rengar. But even assuming that the internal e-mails were enough to establish that a policy existed, there was evidence before the Board that Licensing in fact did not disregard that policy. Specifically, the very e-mails on which Spot relies, as well as O'Dell's later declaration, reveal that Licensing was aware of Spot's complaints about Rengar's building. They also reveal that Licensing discussed the complaint internally; that Licensing did not consider a facility "mobile" so long as someone could not "just back up and drive away"; and that Licensing made a determination, based on the facts and circumstances—including a final inspection—that Rengar's facility was not mobile and could be licensed. Furthermore, the record indicates that the Board, which listed the e-mails and O'Dell's declaration among the items it considered, gave due consideration to the mobility argument. And reasonable minds can differ as to whether a modular building is "mobile," such that someone can "just back up and drive [it] away," merely because it has a hitch and wheels on it. For these reasons, the Board's determination was not arbitrary or capricious.

Spot disagrees and asserts that Licensing could not have taken the trailer hitch and wheels into account because, as of March 12, 2018, Licensing was not even aware of the issue. In support of this assertion, Spot relies on Jones's March 12, 2018, e-mail, in which she wrote, "I didn't see any pictures before it

went to inspection."  But the fact that Jones herself was not aware of the mobility issue does not demonstrate that Licensing as a whole was unaware, and in any event, Spot does not dispute that the issue was brought to light just *before* Rengar's final inspection.  Therefore, Spot's reliance on Jones's e-mail is misplaced.

Spot next asserts that its attorney's October 2018 photos showing Rengar's building with a trailer hitch and wheels attached to it demonstrate that the building was mobile.  But as discussed, reasonable minds can differ as to whether the presence of a hitch and wheels renders a modular building mobile so as to preclude licensure—particularly where, as here, Spot points to no statute or regulation precluding licensure of modular buildings.  Thus, the photos do not demonstrate that the Board's final order was arbitrary or capricious.

We reverse the superior court and reinstate the order of the Board denying Spot's application for a marijuana retailer license in Mukilteo.

_____

WE CONCUR:

_____  _____